438 So.2d 279 (1983)
Phillip GANDY, Appellant,
v.
STATE of Mississippi, Appellee.
No. 53900.
Supreme Court of Mississippi.
September 28, 1983.
*281 E. Hugh Cunningham, William B. Kirksey, Jackson, for appellant.
Bill Allain, Atty. Gen. by Marvin L. White, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, C.J., and BOWLING and ROBERTSON, JJ.
ROBERTSON, Justice, for the Court:

I.
Phillip Gandy has been convicted in the Circuit Court of Hinds County on a charge of conspiracy to deliver cocaine in violation of Miss. Code Ann. § 41-29-139(c) (Supp. 1982). He has been sentenced to serve five years in the custody of the Mississippi Department of Corrections.
As he is of right entitled, Gandy has on this appeal asked that we review his conviction. Most serious of the questions presented regards the admissibility of an incriminating fingerprint Gandy says was obtained through an illegal arrest. Other evidentiary rulings, as well as the court's refusal to grant several requested instructions, have also been assigned as error.
Having carefully reviewed this entire matter concentrating of course on the errors urged, we affirm.

II.
The operative facts occurred in late autumn of 1980. Officers of the State Bureau of Narcotics had under investigation one Jimmy Birdwell who lived in the Clinton, Mississippi, area. In November of 1980 Officer Eddie Berry, utilizing the services of a confidential informant, made a buy of four grams of cocaine from Birdwell for $600. On December 6, 1980, another buy was made from Birdwell, this time one ounce of cocaine for $2,000. In the course of these two buys the officers learned that Birdwell's potential supplier was James Dale Nicholson.
A week later, Berry and Agent Pam Vandenberg set up a new deal with Birdwell. They proposed to purchase five ounces of cocaine for $10,000. The agents were confident that Birdwell would obtain his supply from Nicholson. They arranged a surveillance on Nicholson's residence in hopes of nabbing the person from whom Nicholson obtained his supply. Their plan was to "bust" Birdwell, Nicholson and Nicholson's supplier, if detected.
On the afternoon of December 14, 1980, state narcotics officials had Nicholson's residence under surveillance. Their dual purpose was to see if a supply would be delivered to Nicholson and to follow Nicholson when he left to make his anticipated delivery to Birdwell. At this time the officers had never heard of Phillip Gandy. They did know that the buy from Birdwell had been arranged for later that afternoon. Based upon their prior observations of Nicholson and Birdwell, they anticipated that Nicholson would that afternoon deliver to Birdwell the cocaine the undercover agents were going to buy from Birdwell. They did not know who would supply Nicholson.
At approximately 1:45 p.m. on December 14, Gandy drove up to Nicholson's residence. He got out of his car and went inside. A few moments later, Gandy came back to his car, got something, and went back inside. Two of the officers testified that Gandy appeared to be carrying a brown paper bag *282 of unknown contents when he came back into Nicholson's house.
At about 3:20 p.m., Gandy and Nicholson emerged from the house and got in their respective cars. Just as they were leaving, a young man pulled up in a Volkswagen, got out of his car and walked over to Nicholson. The two spoke briefly and then all of them  Gandy, Nicholson and the young man  went their separate ways. At this time, the narcotics agents surveilling the house separated and followed Nicholson and Gandy who drove off in different directions. The record does not show that anyone followed the Volkswagen.
In any event, as soon as it became clear to the officers that Nicholson was going to Birdwell's apartment, they pulled him over. A quick search revealed that Nicholson had in his custody three and a half ounces of cocaine plus a quantity of Inisotol, a cut. Nicholson also had three-quarters of a gram of cocaine in a vial on his person. At this point the officers became convinced that Nicholson had obtained the cocaine from Gandy. They radioed the other agents following Gandy and instructed them to arrest him, which was done.
Armed with the information recited above, undercover Agent Bill Marshall stopped Gandy as he was leaving the Jackson area headed South. Marshall placed Gandy under arrest, searched Gandy and the car but found no drugs or drug related paraphernalia. Clearly, Gandy was breaking no law at the time he was pulled over. He was, nevertheless, taken to the Jackson Police Department, fingerprinted and questioned briefly.
Subsequently, the officers conducted a search of Nicholson's home. They found an additional quantity of cocaine, along with various items of cocaine paraphernalia. On Nicholson's dresser, they found Phillip Gandy's telephone number written on a piece of paper.
Most significant was a brown pyrex bowl which had been used to "cut" the cocaine. The bowl was dusted for fingerprints. One of the prints obtained matched one of the prints taken from Phillip Gandy the afternoon of his original detention.
The chief witness for the State was the co-defendant, James Dale Nicholson. Nicholson had entered a guilty plea in exchange for a plea bargain that he would receive a five year sentence, two to be served and three suspended.
Nicholson testified that shortly before December 14 Birdwell had called him and asked if he (Nicholson) could supply five ounces of cocaine. Nicholson said he in turn called Gandy who lived in Crystal Springs and told Gandy he needed five ounces of cocaine. According to Nicholson, on December 14 Gandy brought him three ounces and that he (Gandy) took the cocaine and cut it with Inisotol, increasing its volume. He said that the cocaine and the cut were mixed in the brown pyrex dish.
Gandy's version was that he was discussing with Nicholson the sale of a motorcycle. Gandy had asked that Nicholson sell his motorcycle on a commission basis. Gandy said that when he went back out to his car, he retrieved not a brown paper bag but an operators manual and other papers related to the motorcycle. He explained his fingerprint on the brown pyrex dish by saying that he had used it as an ashtray while he was visiting Nicholson.
The Nicholson-Gandy connection received modest corroboration from telephone company records. These reflected a series of calls prior to and on December 14, 1980, from Nicholson's telephone to the house where Gandy lived.
At the conclusion of all of the evidence, the jury found Gandy guilty as charged. This appeal has followed.

III.
Gandy challenges the State's use of the fingerprint obtained on the evening of December 14, 1980. This fingerprint was an important piece of evidence in the State's case, for, when matched with the print lifted from the brown pyrex bowl, it served to corroborate the testimony of the co-defendant turned State's witness, James Dale *283 Nicholson. Gandy charges that his original arrest was made without probable cause, and was thus illegal, and that any evidence which became available to the State as a result of that arrest was "the fruit of the poisonous tree", and thus inadmissible.
Our question turns on whether Officer Marshall had probable cause to arrest and detain Gandy on the afternoon of December 14, 1980. Without doubt, if that arrest be found not supported by probable cause, receipt of the fingerprints as evidence would be reversible error. Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969).
The standard we apply is found in Florence v. State, 397 So.2d 1105 (Miss. 1981) where we stated:
Probable cause or reasonable grounds justifying an arrest without a warrant exists where the facts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a narcotics offense has been or is being committed. 397 So.2d at 1106.
Here the officers knew that the buy (from Birdwell) had been arranged. They had reasonable grounds for believing Nicholson was Birdwell's supplier. They thought it possible, if not likely, that the person supplying Nicholson would make a delivery to Nicholson's home at some time the day of December 14. Shortly after Gandy arrived at Nicholson's home, he retrieved a brown paper bag from his car. Approximately an hour later, Nicholson and Gandy left simultaneously, going in opposite directions. Law enforcement officers followed each. As it had become clear that Nicholson was on his way to Birdwell's home (as had been anticipated), Nicholson was stopped. A quantity of cocaine was found in his possession. This information was radioed to Marshall who was following Gandy. At this time, Officer Marshall had reasonable grounds for believing that Gandy was involved in the by now aborted cocaine sale.
We emphasize that it is not necessary that, in order to arrest Gandy lawfully, Marshall have sufficient information to convict. Before a warrantless yet lawful arrest could be made, it was not necessary that Marshall have reasonably believed beyond a reasonable doubt that Gandy was involved in the cocaine deal. Marshall need only have entertained a reasonable belief that Gandy was involved  a belief rising above mere unfounded suspicion.
The prescience of a Hercule Poirot was hardly requisite to a belief that earlier that afternoon Gandy had been involved in unlawful cocaine trafficking, in association with Nicholson. Most reasonable men knowing what Marshall knew immediately before ordering Gandy to pull over would have so believed. That there may have been other equally plausible explanations for Gandy's presence at Nicholson's home  to arrange for the sale of a motorcycle, to pay a social visit, or whatever  does not negative Marshall's probable cause to believe that Gandy may likely have some involvement in the Nicholson-Birdwell cocaine deal. Had Marshall failed to stop Gandy for questioning (and fingerprinting), he would have been derelict in his duty.

IV.
In rebuttal, the State introduced computer printouts of two telephone statements on Nicholson's telephone number for the months of December 1980 and January 1981. These statements reflected charges for telephone calls made to or from a telephone listed in the name of Kenneth Bowman, Jr. in Crystal Springs, Mississippi. Gandy had been living with Bowman. The exhibits indicated two calls on the morning of December 14, 1980, and eight calls in the ten days immediately prior.
Gandy made timely objection to introduction of these telephone records. Here he urges that the State had not laid the proper foundation to establish their reliability and cites King v. State Ex Rel Murdock Acceptance Corp., 222 So.2d 393 (Miss. *284 1969) and Chrysler Credit Corp. v. Bank of Wiggins, 358 So.2d 714 (Miss. 1978).
The documents introduced were copies of microfiche records maintained by South Central Bell Telephone Company. The records were regular on their face and did suggest telephone calls from a number where Nicholson lived to and from a number where Gandy lived. The records were identified as telephone company records, a proposition Gandy does not seriously dispute.
Gandy urges that the King and Chrysler cases required that the State demonstrate positively, first, that the electronic equipment preparing the records was standard, second, that the entries were made in the regular course of business and, third, that the records have such trustworthiness as to justify their admission. A review of these records makes it clear that these requisites are met. That the State failed to take up a half a day of the Court's time describing the intricacies of the electronic equipment used by the telephone company in the preparation and storage of these records is hardly grounds for reversal.
There is an anomaly in Gandy's position here that proves the point. Both Nicholson and Gandy testified that there were telephone calls back and forth between the two prior to and on December 14. Their memories were vague. Neither remembered the number of calls or their exact dates. (Gandy, of course, suggests that these calls were in connection with the sale of the motorcycle.) No one would question admissibility of this general and nonspecific testimony of these two witnesses, obviously imprecise as it was. The telephone company's microfiche records are far more credible evidence of the exact dates and times of the telephone calls (although nothing is suggested identifying the parties or the subject matter of the conversations). It would be absurd to allow introduction of what Gandy and Nicholson remembered without allowing that evidence to be supplemented by the records from the telephone company.
Nothing said here gives any note of sanctity to electronically stored data or other similar records. Those records can be in error as any others. Trial judges are to assure their trustworthiness before they are to be allowed into evidence. Here, Gandy offers not one word of credible testimony that there is any inaccuracy or incompleteness in the records. Under these circumstances, the trial judge properly received them into evidence. Gandy's objection, if anything, goes to weight and not to admissibility.

V.
Gandy asserts as error the trial court's refusal to grant requested jury instruction no. 27. That instruction would have told the jury it could not convict "upon mere suspicion or conjecture". The beyond-a-reasonable-doubt standard was repeated, albeit in our reading confusingly.
Defendant's instruction no. 5, which was given, contains a proper statement of the State's burden of proof. Taken as a whole, the instructions given the jury made it abundantly clear that the jury was not to base its verdict on suspicion or conjecture. This assignment of error, accordingly, is without merit.

VI.
Finally, Gandy urges that he was entitled to a peremptory instruction. He correctly notes that the indictment charges conspiracy to "deliver" cocaine in violation of Miss. Code Ann. § 41-29-139(c). This section provides:
Except as authorized by this Article, it is unlawful for any person to sell, barter, or transfer a controlled or counterfeit substance for money or for other consideration.
Since the statute does not use the word "deliver", Gandy claims that the indictment was faulty. The point is specious. In the first place "transfer" is surely equivalent to "deliver". Besides, Gandy never challenged the indictment below. Miss. Code Ann. § 99-7-21 (1972) requires a defendant to demur to the indictment before the jury is *285 impaneled and not afterward. We find no defect in the indictment, but if there was one it has been waived. Jones v. State, 383 So.2d 498 (Miss. 1980); Bowen v. State, 309 So.2d 524 (Miss. 1975).
Our general concern is whether there is in the record evidence sufficient to support the jury's verdict that Phillip Gandy was guilty of conspiracy to deliver cocaine. As we have said repeatedly, the jury is charged with the responsibility for weighing and considering conflicting evidence and the credibility of witnesses. See, e.g., Gathright v. State, 380 So.2d 1276, 1278 (Miss. 1983). Once the jury has returned a verdict of guilty in a criminal case, we are not at liberty to direct that the defendant be discharged short of a conclusion on our part that on the evidence, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could find beyond a reasonable doubt that the defendant was guilty. Jackson v. Virginia, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560, 576 (1979); Pearson v. State, 428 So.2d 1361, 1364 (Miss. 1983).
In his brief, Gandy recognizes these well settled limitations on our appellate review powers. He even acknowledges several of our cases to that effect. Lee v. State, 338 So.2d 395 (Miss. 1976); Glass v. State, 278 So.2d 384 (Miss. 1973); Davenport v. State, 144 Miss. 273, 109 So. 707 (1926).
In this case, if all the evidence is considered in the light most favorable to the State, one must take as true the testimony of James Dale Nicholson, Gandy's accomplice and co-conspirator. In this state, the uncorroborated testimony of an accomplice may be sufficient to convict even when the charge is capital murder and the sentence imposed is death. Oates v. State, 421 So.2d 1025 (Miss. 1982). While an accomplice's testimony is to be viewed with great caution and suspicion, it is sufficient to sustain a conviction unless it is improbable, self-contradictory, or substantially impeached. Catchings v. State, 394 So.2d 869 (Miss. 1981); Pearson v. State, 428 So.2d 1361, 1363 (Miss. 1983).
Nicholson's testimony, of course, was not wholly uncorroborated. The presence of Gandy's fingerprint on the pyrex mixing bowl was quite incriminating. The telephone records offered mild corroboration. And Gandy's own testimony confirmed everything the State claimed about his relationship with Nicholson except criminal activity. In this state of the record we are without power to disturb the jury's verdict.
AFFIRMED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and ROY NOBLE LEE, BOWLING, HAWKINS, DAN M. LEE and PRATHER, JJ., concur.