491 So.2d 837 (1986)
Jimmy Michael (Jimbo) STRINGER
v.
STATE of Mississippi.
No. 54805.
Supreme Court of Mississippi.
July 16, 1986.
*838 Harry L. Kelley, Jackson, for appellant.
Bill Allain, Atty. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.

ON PETITION FOR REHEARING
HAWKINS, Justice, for the Court:
The petition for rehearing filed by the state is overruled. The original opinion is withdrawn. The following is the opinion of the Court.
James Michael (Jimbo) Stringer appeals from his conviction of capital murder and sentence to life imprisonment.
Because of the introduction into evidence of virtually all of his testimony from a prior trial in which his father was defendant as part of the state's case-in-chief, we reverse.

FACTS
On Monday evening, June 21, 1982, Birty Ray McWilliams and Nellie S. McWilliams (Mr. and Mrs. Ray McWilliams) were brutally murdered at their home in Jackson, Mississippi. On July 2, 1982, a Friday, Jimmy Michael (Jimbo) Stringer, Defendant below and Appellant here, was arrested and charged with the two murders. Also charged were James R. Stringer (the father of the present Defendant), John Mack Parker, Mike Meddars and Rhonda Brock.
On July 9, 1982, Jimbo Stringer was formally charged in an indictment returned by a Hinds County grand jury with the capital murder of Nellie S. McWilliams in the course of an attempted robbery of Birty Ray McWilliams, in violation of Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1983). Stringer entered a plea of not guilty to all charges. At that time Jimbo Stringer was only 20 years old.
On Monday, January 31, 1983, this case was called for trial in the Circuit Court of the First Judicial District of Hinds County, Mississippi. On Friday, February 4, 1983, the jury returned its verdict finding Jimbo Stringer guilty of capital murder. That afternoon, Stringer was put to trial on the question of sentence and on Friday evening, February 4, 1983, at approximately 10:18 p.m. the jury certified to the court that it was unable to agree upon punishment. In compliance with Miss. Code Ann. § 99-19-103 (Supp. 1983), the circuit court sentenced Jimbo Stringer to life imprisonment.
Following the usual post-trial motions, all of which were denied, this appeal has been perfected.
What happened on the evening of June 21, 1982, has been recited in this Court's opinion regarding the appeal of James R. Stringer (the instant Appellant's father) which is reported as Stringer v. State, 454 So.2d 468, 471-473 (Miss. 1984). The facts there are stated extensively, regarding the defendant James R. Stringer, not Jimbo. Still that narrative makes necessary here only an abbreviated statement of facts.
The two principal witnesses for the state in both trials were Mike Meddars and Rhonda Brock. They testified that, during the day of June 21, 1982, they met with James R. Stringer and planned the murder and robbery.
James R. Stringer was in the business of buying and selling gold, silver and jewels. He owned a place of business in Jackson which in large part was operated and managed by his son, Jimbo. Ray McWilliams was also in the business of buying and selling jewelry and operated from his home. Testimony in the record reflected that in connection with his business he kept considerable sums of money in a safe in his home. The Stringers and Ray McWilliams had done business with each other in the past.
Parker, Meddars, Brock and the two Stringers met in the early part of Monday evening. Jimbo Stringer, at his father's request, brought extra bullets and a shotgun *839 with a shortened barrel and handle called a "riot" gun  a case for which is one of the items of evidence in controversy here.
The five then left for the McWilliams' home. James R. Stringer and Rhonda Brock got out of the car and went to the door. When McWilliams opened the door, James R. Stringer drew his .357 Magnum revolver and ordered McWilliams to remain in the room. McWilliams grabbed for the pistol and the two started to scuffle during the course of which the pistol fired striking nothing but the wall.
By this time Jimbo Stringer, Parker and Meddars had entered the premises. According to Brock and Meddars, Parker fired and killed Ray McWilliams. Nellie S. McWilliams was on the floor beginning to crawl when Jimbo Stringer placed the end of the riot gun to the back of her head and pulled the trigger, killing her instantly.
Suffice it to say that there was substantial evidence in the record from which the jury could have concluded that Jimbo Stringer shot and killed Nellie S. McWilliams while he was engaged with the others in an attempt to rob Birty Ray McWilliams.

LAW
Stringer's first assignment of error is the admission into evidence of a shotgun with a 30-inch barrel and a shotgun case. In his brief his sole basis for error in the admission of this evidence is that it was the fruit of an invalid search. His initial trial objection, however, was that these items were irrelevant.
The record reveals the state brought the matter of introducing these items to the trial court's attention during a recess:
(RECESS TAKEN. THEREAFTER, THE FOLLOWING PROCEEDINGS WERE HAD AND DONE OUT OF THE PRESENCE OF THE JURY.)
BY MR. KELLEY: Judge, we have a minor problem with this thing. Judge, I have read the transcript of both prior trials and find that the State has put on evidence intending to show that the deceased was killed with a riot gun, a short shotgun. Now, this shotgun that was brought in, I understand, was seized at the Defendant's home when he was arrested. This shotgun has a thirty inch barrel with a full choke. If it has any relevancy and the State is now contending that this was the shotgun that was used in the slaying, we have no objection to letting it in provided the search warrant was good. If they're contending that it was not the shotgun that was used, we would object to it because obviously it's only used to prejudice the Jury. This is a matter we'd like to go into outside the presence of the Jury because the mere fact that a shotgun was laying on the table before the Jury, whether or not it gets into evidence, would be prejudicial.
BY THE COURT: Well, we'll got into it outside the presence of the Jury. Go ahead. What do you have?
BY MR. KELLEY: Well, it depends on what they have. I  I don't have anything to do with it other than there hadn't been any evidence  in the first place, there's been no evidence that a .12 gauge shotgun was used. In the second place, in both prior trials the State has said that a riot gun was used and this is not a riot gun, so if they're justifying it, I'd like to go into the search, you know.
BY THE COURT: That's the first thing I would say. Who are your witnesses on the search?
BY MR. PETERS: Rod Erikson, Your Honor.
R. 420-422.
Following this colloquy the state offered testimony on the validity of the search, and the court overruled the defense objection.
When the state rested the defense moved for a directed verdict and also to exclude the evidence offered by the state, which was overruled.
Upon appeal Stringer argues that the search was constitutionally invalid because there was not probable cause to issue the search warrant, and it was therefore reversible *840 error to admit the items into evidence.
With a capacity to ignore the obvious not matched this side of Poe's "The Purloined Letter," defense counsel upon appeal enigmatically makes no mention of relevancy, a point he fully recognized during trial.
We need not address the nettlesome question raised by Stringer's counsel in this assignment. This case is being reversed on another ground. We do note for the trial court that these items are clearly irrelevant and should not be admitted into evidence upon retrial.

INTRODUCTION OF TESTIMONY GIVEN AT HIS FATHER'S TRIAL
Stringer next assigns as error the trial court's overruling of his objection to the state's introduction of his entire testimony given at a prior trial where he was a mere witness. That prior trial was the capital murder trial of his father, James R. Stringer. In fact, Jimbo's entire prior testimony was not introduced, but ninety percent of it was.
Stringer concedes, as he must, that any prior testimony is admissible if it is inculpatory or if any statements are relevant to the issues in the case or if there are statements which are declarations against penal interest. Here, however, practically the entire testimony from the prior trial was introduced, and in a rather curious form. The trial judge went through the entire transcript with counsel. Portions of Stringer's testimony at the prior trial were deleted, e.g., references to Stringer having smoked the marijuana the night in question. In addition, various points where objections had been made and sustained in the prior testimony were deleted. Then the court reporter who took the testimony was called and read to the jury the edited transcript of Stringer's testimony. This edited "narrative" of the court reporter extends for almost 40 pages in the transcript (R. 843-871), and includes a rather extensive cross-examination by the district attorney which at times amounts to little more than a harangue.
This evidence was offered below as a part of the state's case-in-chief. Had Jimbo Stringer taken the stand, and if his prior testimony had been used to impeach him, we would have a different situation. Or, if he had taken the stand and the state had offered his prior testimony as part of its rebuttal, again matters would be different.
Prior to his testimony at his father's trial, Jimbo Stringer was advised of his right to remain silent by the trial judge in open court. He was expressly told that anything he said at his father's trial might be used against him in his own subsequent trial. In addition, Jimbo Stringer was represented by counsel at the time of that testimony and, indeed, it was his own counsel who questioned him on direct examination.
Over objection the trial court permitted the court reporter to take the stand and state, from her transcribed notes, the questions the lawyers had asked and the answers Jimbo Stringer had given. The court reporter's testimony technically was hearsay, but the context suggests the familiar former testimony exception to the hearsay rule. See Smith v. State, 247 So.2d 705, 706 (Miss. 1971); Lee v. State, 124 Miss. 398, 416, 86 So. 856, 858 (1921).
The foremost requirement of the former testimony exception, however, is that the witness or declarant be unavailable. Williams Yellow Pine Co. v. Williams, 187 Miss. 425, 432, 193 So. 1, 2 (1940); Owens v. State, 63 Miss. 450, 452-53 (1896). Dicta in some cases have suggested that in a criminal trial the out-of-court declarant must have actually died in order to be declared unavailable. Smith v. State, 247 So.2d 705, 706 (Miss. 1971). See McCormick, Evidence § 253(6), at 612 (2d Ed. Supp. 1978).
Our attention has been called to Arrington v. State, 411 So.2d 779 (Miss. 1982) and Mackmasters v. State, 83 Miss. 1, 35 So. 302 (1903). In each of these cases the prior testimony offered was that given by the defendant at his own prior trial  not at the prior trial of someone else (although arising *841 out of the same general incident). More important, Arrington and Mackmasters correctly hold that so much of a defendant's testimony at a former trial which constitutes an admission, as that concept is understood in our law of evidence, may be presented as evidence at a subsequent trial of that same defendant. Nothing in Arrington and Mackmasters holds or suggests that prior testimony that does not fit within the definition of an admission may be so used.
The prior testimony of Jimbo Stringer as introduced to the jury at the trial in question is unremarkable. His description of the events of June 21, 1982, is simply that he came home from work early that day and never left the apartment that night, i.e., he did not go to the McWilliams' home. He states that he talked to his father on the telephone several times that evening. Stringer admitted that he did own a 12 gauge shortgun but stated that he sold it a few months before the McWilliams murders to someone named John who lives in Oregon.
Other than the admission that he once owned a gun similar to one of the guns used in the McWilliams killing, there are no statements in the testimony which are in any way incriminating and therefore admissible as admissions. On the other hand, there is the extensive cross-examination which is pure impeachment testimony. If Jimbo Stringer had taken the stand in his own defense at the trial in question, arguably this testimony would have been admissible in rebuttal. But he did not and this previous testimony should not have been admitted. See 29 Am.Jur.2d Evidence § 738 (Supp. 1984) (former testimony is hearsay and must fit into an exception such as "admission"); McCormick, Evidence, § 254, at 615-616 (2d Ed.Supp. 1978) (same).
We hold that the trial court committed reversible error when it received into evidence portions of the prior testimony of Jimbo Stringer which could not fairly be characterized as admissions and when it overruled Stringer's objections thereto.
The judgment of conviction of Jimmy Michael (Jimbo) Stringer of the crime of capital murder and the sentence of life imprisonment imposed pursuant thereto are vacated and reversed, and this case is remanded to the Circuit Court of Hinds County for a new trial on all issues, consistent with this opinion.
REVERSED AND REMANDED.
WALKER, C.J., ROY NOBLE LEE, P.J., and DAN M. LEE and ANDERSON, JJ., concur.
ROBERTSON, PRATHER and SULLIVAN, JJ., specially concur.
GRIFFIN, J., not participating.
ROBERTSON, Justice, concurring:

I.
This case is before the Court on petition for rehearing filed by the State of Mississippi. The case properly presents our first opportunity to reexamine Mississippi's sixty-four year old rule precluding use in a criminal prosecution of illegally seized evidence now that the Supreme Court of the United States has relaxed the federal equivalent of this exclusionary rule in two decisions formally released July 5, 1984. United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) and Massachusetts v. Sheppard, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). Despite what I regard as the obvious need of the public in general and law enforcement in particular for a definitive statement from this Court regarding the Leon good faith exception, the lead opinion merely labels this a "nettlesome question" and tiptoes past.
I am not convinced that the public interest requires  or that our Constitution permits  our abandonment of our longstanding exclusionary rule which dates back at least to 1922. Tucker v. State, 128 Miss. 211, 223, 90 So. 845, 845-46 (1922). Our recent adoption of the new federal totality-of-the-circumstances standard [Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)] in evaluating determinations *842 of probable cause in procurement of search warrants, coupled with our other evidentiary rules already in place, have the potential for amelioration of such arbitrary and capricious exclusions of probative evidence as have occasionally occurred in recent years. See Lee v. State, 435 So.2d 674, 676-77 (Miss. 1983) (adopting a practical totality-of-the-circumstances test); Hall v. State, 455 So.2d 1303, 1308-09 (Miss. 1984) (same); Breckenridge v. State, 472 So.2d 373, 376-77 (Miss. 1985) (same).
Our exclusionary rule serves the salutary purpose of requiring that the State of Mississippi respect the probable cause requirements of Article 3, Section 23 of the Mississippi Constitution of 1890, not to mention those comparable strictures of the Fourth Amendment to the Constitution of the United States. It makes us take these rights seriously. Until our attention is called to substantial recurring miscarriages of justice proximately flowing from the enforcement of our exclusionary rule and until equally effective alternatives are presented, we should not consider abandonment of our rule.
In the case at bar the State was allowed, over timely defense objections, to present to the jury a long-barrel shotgun and a short-barrel shotgun case which had been seized from the apartment where Jimbo Stringer was living. The seizure was effected pursuant to a search warrant the issuance of which was not supported by probable cause. The point is the principal error assigned on this appeal. I do not understand how we might duck it consistent with the proper discharge of our institutional responsibilities. I would apply our exclusionary rule, hold that the admission of these two items of evidence was error, and reverse the conviction and sentence appealed from.

II.

A.
Stringer assigns as error the trial court's ruling allowing a long-barrel shotgun[1] and a short-barrel shotgun case to be received into evidence over his objection. The primary basis for the objection was Stringer's claim that the two items had been seized from the apartment where Jimbo Stringer was living pursuant to an unlawfully issued search warrant.[2]
A suppression hearing was held outside the presence of the jury. There the State proved that on July 2, 1982, Detective Rodney D. Eriksen prepared an affidavit for a search warrant to search the premises known as Apartment 122, Lakeside Villa Apartments. Attached to the affidavit was Detective Eriksen's Statement of Underlying Facts and Circumstances which, in pertinent part, read as follows:
On July 2, 1982, information was received by Homicide Detectives from a confidential informant that Jimmy Michael Stringer and James R. Stringer had participated in the shooting deaths of Birty Ray McWilliams and Nellie S. McWilliams on June 21, 1982. A handgun, and a 12 guage [sic] shotgun were used in the commission of these murders. *843 Jimmy Michael Stringer is known to be staying in Apartment 122 of the Lakeside Villa Apartments located at 3665 Sykes Park Drive.
The affidavit was then presented to Judge Patricia Hancock, City Judge for the City of Jackson, Mississippi. According to Detective Eriksen,
We advised Judge Hancock what the information leading to the issuance of this search warrant was based on what the crime involved with. Went over the case with her.
The State never offered evidence of any specific facts or details furnished orally to Judge Hancock that she may have used in her probable cause determination.
Immediately thereafter, Judge Hancock issued the search warrant. At that point Detective Eriksen accompanied by three other Jackson police officers went to the apartment in question. They knocked on the door and received no answer. The officers then obtained a pass key from the apartment manager and made their search of the apartment, in the course of which they located and seized the long-barrel shotgun and the short-barrel shotgun case which are the subject of the instant assignment of error.

B.

1.
Our initial inquiry ought be whether there was, within the meaning and contemplation of Article 3, Section 23, of our Constitution, probable cause for the issuance of the search warrant. In making such an inquiry we keep well in mind that the State bears the burden of proof that evidence sufficient to constitute probable cause was presented to the issuing magistrate. By way of analogy, we have repeatedly held that, where the issue is whether the accused consented to a search without a warrant, the burden is upon the State
to prove beyond a reasonable doubt that the accused voluntarily consented to the search of his property.
Luton v. State, 287 So.2d 269, 272 (Miss. 1973); see also Penick v. State, 440 So.2d 547, 551 (Miss. 1983); Jackson v. State, 418 So.2d 827, 830 (Miss. 1982); Matthews v. State, 394 So.2d 304, 307-08 (Miss. 1981).
Also analogous are our holdings that the State has the burden of proving the voluntariness of a contested confession. Jones v. State, 461 So.2d 686, 697 (Miss. 1984); Neal v. State, 451 So.2d 743, 753 (Miss. 1984); Stevens v. State, 228 So.2d 888, 889 (Miss. 1968); Dover v. State, 227 So.2d 296, 300 (Miss. 1969). Indeed, I know of no context in which this sort of issue is presented where we have not held that the burden of proof is on the State. See, e.g., Butler v. State, 212 So.2d 573, 577 (Miss. 1968) (State's burden of proof discussed); Abston v. State, 361 So.2d 1384, 1391 (Miss. 1978) (same). Cf. Nix v. Williams, 467 U.S. 431, 443, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377, 387 (1984) (burden of proof on State in inevitable discovery case).
In the present context we consider the quality of the evidence presented to the issuing magistrate. At a suppression hearing the State is required to establish not just that probable cause in fact existed for the issuance of the warrant, but that specific underlying facts and circumstances sufficient to constitute probable cause existed and were in fact communicated to the issuing magistrate prior to the issuance of the warrant.
I emphasize the practical sense in which the term "probable cause", as used in Section 23 of our Constitution, must be understood. Strode v. State, 231 So.2d 779 (Miss. 1970) described it as
a practical, non-technical concept, based upon the conventional considerations of everyday life on which reasonable and prudent men, not legal technicians, act.
231 So.2d at 782.
It was not necessary that Detective Eriksen have convinced Judge Hancock beyond a reasonable doubt that the murder weapons were in the apartment in which Jimbo Stringer was living, nor was it necessary that the trial judge at the suppression hearing so find. Rather, the warrant may lawfully *844 have issued had Eriksen presented reasonably trustworthy information suggesting a credible probability that Jimbo Stringer was involved in the McWilliams murders and that the items sought to be seized were in his apartment. Cf. Gandy v. State, 438 So.2d 279, 283 (Miss. 1983).

2.
The courts of this land have struggled for more than two decades to flesh out just what quality and quantity of evidence would be required to establish probable cause, i.e., what it is that the state must show when the validity of a warrant is under attack. As the highest court of this state, we have until recently enforced faithfully the two-pronged test derived from Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Under that test, before a valid search warrant could be issued, the magistrate was required to be informed of (1) some of the underlying circumstances from which the informer concluded that the defendant was the one guilty of the offense (the "basis of knowledge" test), and (2) some of the underlying circumstances from which the officer concluded that the informer was reliable (the "veracity test"). Read v. State, 430 So.2d 832, 834-35 (Miss. 1983); Strode v. State, 231 So.2d 779, 783 (Miss. 1970); O'Bean v. State, 184 So.2d 635, 638 (Miss. 1966).
The Aguilar-Spinelli test for probable cause was a federal test, obligatorily enforced by the states when rights secured by the Fourth and Fourteenth Amendments to the United States Constitution were at issue. That federal standard has now given way to the totality of the circumstances test. Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).
While we had full authority to continue to construe "probable cause" within Section 23 of our own Constitution in accordance with the Aguilar-Spinelli two-pronged test, we have not done so. Lee v. State, 435 So.2d 674, 676 (Miss. 1983); Hall v. State, 455 So.2d 1303, 1308-09 (Miss. 1984); Breckenridge v. State, 472 So.2d 373, 376-77 (Miss. 1985). We perceived the practical reality that there may be many cases in which the evidence on one prong or the other of the Aguilar-Spinelli test might be meager but where, considering the totality of the circumstances presented to the magistrate, probable cause was evident. Accordingly, in Lee v. State, 435 So.2d 674 (Miss. 1983), we accepted the new "totality of the circumstances" analysis for determining whether probable cause exists[3] whether the question arises under our state or federal constitution.
Quoting from Gates, we recognized that the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the `veracity' and `basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a `substantial basis for ... concluding' that probable cause existed... .
435 So.2d at 676.
In Lee the Court applied the new Gates test and determined that probable cause existed for the warrant. In Lee, however, there was presented to the magistrate evidence that
the informer's information was based on personal observations. Moreover, there was both corroboration of the informer's account through various sources as well as other information which indicated that the informer had given reliable information in the past. (Emphasis added)
435 So.2d at 677.
Similarly, in Hall v. State, 455 So.2d 1303 (Miss. 1984), while not relying expressly *845 upon Gates, this Court articulated a totality-of-circumstances test and upheld the facial validity of a warrant/affidavit. In Hall, there was an extensive investigation and the information supplied by the confidential informant was verified in part by the president of the bank where the contraband was being stored. 455 So.2d at 1308-09. See also Walker v. State, 473 So.2d 435, 438 (Miss. 1985); Breckenridge v. State, 472 So.2d 373, 377 (Miss. 1985); McCommon v. State, 467 So.2d 940, 941 (Miss. 1985).

3.
In the case at bar, the trial judge reviewing the probable cause determination of the issuing magistrate had at best a skeleton set of facts. Without resorting to substantial speculation or conjecture, the best that may be said of the information we know (from the record) Judge Hancock had before her is that it was uncorroborated hearsay supplied to officers by a confidential informant of unknown reliability. This is so even when we remember that under our law, in addition to the written statement of underlying facts and circumstances found in the affidavit for search warrant, facts presented orally to the issuing magistrate may be considered in support of probable cause. Lee v. State, 435 So.2d 674, 677 (Miss. 1983); Read v. State, 430 So.2d 832, 834-35 (Miss. 1983); Wilborn v. State, 394 So.2d 1355, 1357 (Miss. 1981). On that score, however, the record is of no help, for it merely reflects the conclusory statement of Detective Eriksen that he advised Judge Hancock what "this search warrant was based on, what the crime involved with. Went over the case with her."
It has long been our rule that issuing magistrates may not constitutionally predicate probable cause determinations upon
the mere conclusion of the affiant, but must base the issuance of a warrant upon some of the underlying facts or circumstances, as to do otherwise would be to accept the affiant's determination rather than his own.
O'Bean v. State, 184 So.2d at 638.
Acceptance by the issuing magistrate of "mere conclusions" has been repeatedly condemned since O'Bean. See, e.g., Walker v. State, 192 So.2d 270, 273 (Miss. 1966); Mosley v. State, 396 So.2d 1015, 1018 (Miss. 1981). See also United States v. Parker, 722 F.2d 179, 182 (5th Cir.1983). That this condemnation of mere conclusions remains a viable doctrine has been made clear in Gates wherein the Supreme Court has reminded us:
Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others.
462 U.S. at 239, 103 S.Ct. at 2333, 76 L.Ed.2d at 549.
Conclusory evidence is just as inadequate when presented to a reviewing court as when presented to the issuing magistrate as a part of the initial probable cause determination. All of this assumes additional importance when we remember that at the suppression hearing the State is charged with the burden of establishing that sufficient specific underlying facts and circumstances were in fact communicated to the issuing magistrate so that he or she could determine from a totality of the circumstances that probable cause existed.
These matters being well in mind, we zero in on the question whether on this record the evidence was such that the trial judge could have found that, applying the totality of the circumstances test, the State had met its burden of establishing that Judge Hancock had probable cause for the issuance of the search warrant on July 2, 1982. The answer inescapably is, No.
The point is made by a contrast of these facts with those in Lee and Hall. Recall that in each of which we have upheld probable cause determinations. First, unlike in Lee or Hall, no evidence was presented here to indicate that the informer's information was based on personal knowledge. Looking carefully to the language of the *846 affidavit, one can only guess at whether the informant was supplying information he or she knew personally or whether he or she was merely passing on some street rumor. Nothing in the oral testimony Detective Eriksen presented to Judge Hancock supplies this omission.
Second, unlike in Lee or Hall, the record fails to reflect that the officers had any corroboration of the information they had received from the confidential informant. Third, unlike in Lee or Hall, there is nothing in the record to show any reason for crediting the "confidential informant" as a source of reliable information.
Speculation and conjecture are necessary to raise the quality of this information above the rank of uncorroborated hearsay related to law enforcement officers by a confidential informant of unknown reliability. When speculation, conjecture and "mere conclusions" are ignored, as under our law they must be, the facts and circumstances presented to Judge Hancock fail to pass muster.
In the era of Aguilar and Spinelli and O'Bean and Strode, a holding on these facts of no probable cause would be elementary. Suffice it to say that neither prong of the two-pronged test (a) the informant's "veracity" or (b) the informant's "basis of knowledge" has been met. A finding of no probable cause under Gates is nearly as elementary  any uncertainty emanating solely from the "newness" of the totality of the circumstances test. That the new test has not cut all moorings to the old has been made clear in cases holding that the "veracity" and "basis of knowledge" prongs of the old are still "highly relevant" in determining whether probable cause existed. United States v. Phillips, 727 F.2d 392, 395 (5th Cir.1984) (citing Illinois v. Gates). In cases where neither prong of the old test has been satisfied, the warrant may not stand. United States v. Marbury, 732 F.2d 390, 396 (5th Cir.1984). This is particularly so where the issuing magistrate is advised of no independent corroboration of what the confidential informant has reported.
In sum, I would hold that the search warrant in question was issued without probable cause in contravention of rights secured to Jimbo Stringer by the Fourth and Fourteenth Amendments to the Constitution of the United States as most recently elucidated in Gates and Lee and Hall.
In the alternative and wholly independent of the foregoing, I would hold that the search warrant in question was issued without probable cause in contravention of rights secured to Stringer by Section 23, Article 3, Mississippi Constitution of 1890 as construed sub silentio in Lee, Hall and progeny.

C.
The question becomes: what consequences flow from seizure of evidence under the purported authority of such an invalid warrant. The State having failed to establish probable cause for the issuance of the search warrant, it would heretofore have followed without further ado that the items of evidence seized were inadmissible upon the trial of the defendant. Such has been the effect of the familiar exclusionary rule.
In July of 1984, the Supreme Court of the United States modified and relaxed the federal exclusionary rule in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) and Massachusetts v. Sheppard, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984) [hereinafter collectively referred to as "Leon"]. Insofar as the Fourth and Fourteenth Amendments to the Constitution of the United States are concerned, evidence seized under an invalid search warrant may nevertheless be used against the defendant so long as the officer executing the warrant was acting in objectively reasonable, good faith reliance on the validity of the warrant. My concern is the extent, if any, to which the new modified federal exclusionary rule should affect not only this case in particular but Mississippi criminal procedural practice in general.
I begin with the proposition that this Court is not required to follow Leon. *847 There are two reasons why this is so. First, Leon does not announce new federal constitutional dogma.[4] That case recognizes that the exclusionary rule has always operated
as a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterent effect, rather than a personal constitutional right of the person aggrieved.
468 U.S. at ___, 104 S.Ct. at 3412, 82 L.Ed.2d at 687. The new modified exclusionary rule announced in Leon is a mere federal rule of evidence. As such, enforcement is not obligatory upon the states.
Second, even if Leon were perceived to announce new federal constitutional dogma (something it clearly does not do), the State of Mississippi would be free to continue to employ its own constitution to enforce the exclusionary rule as has heretofore been the practice. Penick v. State, 440 So.2d 547, 551-52 (Miss. 1983). The states, consistent with the Supremacy Clause, U.S. Const. Art. VI, cl. 2, have authority to construe their own constitutions in ways not wholly consonant with the U.S. Constitution where the effect of the state's construction is to afford greater protections for the individual. The Supremacy Clause proscribes what a state may do with its own constitution only where the state would afford the individual lesser rights and protections than does the U.S. Constitution. See Michigan v. Long, 463 U.S. 1032, 1037, 1040, 103 S.Ct. 3469, 3474, 3476, 77 L.Ed.2d 1201, 1212, 1214-15 (1983); Connecticut v. Johnson, 460 U.S. 73, 81 n. 9, 103 S.Ct. 969, 974 n. 9, 74 L.Ed.2d 823, 830 n. 9 (1983); Pruneyard Shopping Center v. Robins, 447 U.S. 74, 81, 100 S.Ct. 2035, 2040-41, 64 L.Ed.2d 741, 752 (1980); Gertz v. Robert Welch, Inc., 418 U.S. 323, 346-47, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789, 809 (1974).
The attitude with which we ought administer this state's constitutional leeway has been well-expressed in Penick v. State, 440 So.2d 547 (Miss. 1983).
We accord to the U.S. Supreme Court the utmost respect in its interpretation of the U.S. Constitution. We must, however, reserve for this Court the sole and absolute right to make the final interpretation of our state constitution and while of great persuasion, we will not concede that simply because the U.S. Supreme Court may interpret a U.S. Constitutional provision that we must give the same interpretation to essentially the same words in a provision of our state constitution.
440 So.2d at 551.
This language[5] is particularly apropos in that Penick held that recent United States Supreme Court Fourth Amendment decisions should not be seen as
diminishing or diluting the strength of ... [our prior cases] in their interpretation of Section 23.
440 So.2d at 551.
This brings us to an important point. The exclusionary rule has been a part of the criminal procedural jurisprudence of this state at least since Tucker v. State, 128 Miss. 211, 223, 90 So. 845, 846-48 (1922). Though it does not per se vest any constitutional right, our exclusionary rule has become a logical and necessary corollary to the accepted construction of Article 3, Section 23, of the Mississippi Constitution of 1890, wholly independent of the Fourth and Fourteenth Amendments to the U.S. Constitution. Hill v. State, 432 So.2d 427, 434 n. 3 (Miss. 1983); Wright v. State, *848 236 So.2d 408, 410 (Miss. 1970); Henry v. State, 253 Miss. 263, 278, 154 So.2d 289, 294-95 (1963); Armstrong v. State, 195 Miss. 300, 303, 15 So.2d 438, 439 (1944); Nash v. State, 171 Miss. 279, 282, 157 So. 365, 366 (1934); Moore v. State, 138 Miss. 116, 153, 103 So. 483, 484-85 (1925).
Popular perception has been that this area of law had been subsumed by federal constitutional jurisprudence by virtue of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); and progeny. That perception has been erroneous, for we have in many cases since Mapp continued to emphasize the independent viability of Section 23 of our Constitution. Penick v. State, 440 So.2d 547, 551-52 (Miss. 1983); Powell v. State, 355 So.2d 1378, 1380 (Miss. 1978); Rome v. State, 348 So.2d 1026, 1029 (Miss. 1977); Simmons v. State, 301 So.2d 565, 568 (Miss. 1974); Scott v. State, 266 So.2d 567, 568-69 (Miss. 1972); Ferguson v. State ex rel Biggers, 250 So.2d 634, 636 (Miss. 1971); Northcutt v. State, 206 So.2d 824, 827 (Miss. 1967); Conn v. State, 170 So.2d 20, 24 (Miss. 1964).
In this context, I accept that Leon has now modified and relaxed the federal requirement that we enforce an exclusionary rule. Untouched, however, is our constitutionally grounded exclusionary rule which we adopted in 1922 in Tucker and have enforced faithfully since that time. In other words, because the prosecution has failed to establish probable cause and because the search warrant was accordingly constitutionally invalid, our exclusionary rule requires a holding that the receipt into evidence of the long-barrel shotgun and the short-barrel shotgun case was error unless, of course, we are prepared to modify that rule.
Should we follow Leon and adopt a reasonable, objective good faith reliance exception to our exclusionary rule? In Tucker back in 1922 we were greatly influenced by Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), wherein the Supreme Court of the United States adopted, for the federal courts only, an exclusionary rule which many perceived to have been based on the Fourth Amendment. That influence derived from the force of Weeks' reasoning, not the authoritativeness of Weeks in this state. In Tucker, we were in no way obligated to follow Weeks, as here we are not this day obligated to follow Leon. It is appropriate nevertheless that we consider the reasons why the United States Supreme Court has modified the federal exclusionary rule.
Leon finds the Supreme Court of the United States engaging in the now-familiar cost-benefit analysis. Is the cost of excluding otherwise probative evidence justified by the benefits derived in the form of securing respect for Fourth Amendment rights?[6]Leon proceeds on the assumption that the exclusionary rule was devised to deter police misconduct when, as we now realize, the party violating the rights secured to the accused by the Fourth Amendment will be the supposedly "neutral and detached" magistrate, not the officer executing the warrant. In adopting the "good faith" exception, Leon reasons that the exclusionary rule cannot logically
have any deterrent effect when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment.
468 U.S. at ___, 104 S.Ct. at 3419, 82 L.Ed.2d at 696.
Leon then concludes, as a proposition of federal criminal evidence law,
that the marginal or non-existent benefits produced by suppressing evidence *849 obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion.
468 U.S. at ___, 104 S.Ct. at 3421, 82 L.Ed.2d at 698.
The Supreme Court's logic is flawed. The reasons why we ought not embrace it are substantial, not the least of which is that the rationale of Weeks is no less compelling than in 1922 when we decided Tucker.
The fundamental error in Leon is its failure to perceive that its new "insight"  that, in the type of cases we are concerned with, it is the issuing magistrate who violates the accused's Fourth Amendment rights, not the police officer  suggests a greater need for the exclusionary rule, not a lesser one.
The citizen, vis a vis the searching law enforcement officer, has at least the theoretical possibility of a remedy in the form of a civil action for damages, see Malley v. Briggs, 475 U.S. ___, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 395-97, 91 S.Ct. 1999, 2004-05, 29 L.Ed.2d 619, 626-27 (1971); Mayes v. Till, 266 So.2d 578, 580 (Miss. 1972); State for the Use of Brooks v. Wynn, 213 Miss. 306, 310-11, 56 So.2d 824, 825-26 (1952), although this remedy is as ineffective as a deterrent to police misconduct as it is inefficacious to protect and compensate the citizen. Against the issuing magistrate  be he or she a justice court judge, a municipal court judge or whatever  the citizen has no remedy. For unlike the law enforcement officers, judicial officers enjoy an absolute immunity to suit for damages. Pulliam v. Allen, 466 U.S. 522, 104 S.Ct. 1970, 1973, 80 L.Ed.2d 565, 571 (1984); Pierson v. Ray, 386 U.S. 547, 554-55, 87 S.Ct. 1213, 1217-18, 18 L.Ed.2d 288, 294-95 (1967).
The application for a search warrant is by its nature an ex parte proceeding. There is no appeal from its issuance. The judicial officer issuing it cannot be sued for damages. However passe the idea may be in other circles, some of us still regard it as important that our citizens be free from unreasonable searches and seizures and from searches made pursuant to warrants issued without probable cause. Miss. Const. Art. 3, § 23. Considering the realities of the warrant process, we perceive no vehicle for protecting these rights of our citizens and assuring that issuing magistrates take seriously their responsibilities other than continued enforcement of this state's exclusionary rule.
Leon fails to consider what would be the appropriate antidote for a refusal by an issuing magistrate to respect the constitutional requirement of a finding of probable cause before a warrant may issue. Leon simply reasons that the exclusionary rule was supposed to deter police misconduct and purports to demonstrate that it cannot logically be expected to achieve that end. Leon never pauses to consider that, assuming arguendo an inaccuracy in the original justification of the rule, it is needed as our only practicable means of getting the attention of issuing magistrates who disregard the rights of persons to be free of searches except under warrants issued upon probable cause.[7]
Turning to another point, I would call attention to the rather startling footnote 6 in Leon, the heart of which is the Court's concession that the exclusionary rule
results in the nonprosecution of between 0.6% and 2.35% of individuals arrested for felonies.
468 U.S. at ___ n. 6, 104 S.Ct. at 3413 n. 6, 82 L.Ed.2d at 688 n. 6.
The footnote goes on in an attempt to minimize the devasting impact the facts have on Leon's logic. Suffice it to say that the data there discussed establishes conclusively what is implicit throughout Leon: That the adoption of the new federal modified *850 exclusionary rule more reflects a shift in judicial/political ideology than a judicial response to demonstrable and felt societal needs. If it ain't broke, why fix it?
No one has demonstrated that the law of search and seizure in Mississippi is broken. Until today, the last thirteen years of search and seizure cases have produced exactly one case in which this Court has been obligated to enforce the exclusionary rule to preclude use of evidence seized under a warrant issued without probable cause: Washington v. State, 382 So.2d 1086 (Miss. 1980). We are aware of no credible evidence that the exclusionary rule has been enforced so as to thwart effective and proficient law enforcement.
We are not the only ones to be less than impressed with the advent of our Leon. At least three of our sister states appear to have resorted to their state's constitution to reject Leon. New York: People v. Bigelow, 66 N.Y.2d 417, 497 N.Y.S.2d 630, 488 N.E.2d 451 (1985); Wisconsin: State v. Grawien, 123 Wis.2d 428, 367 N.W.2d 816 (Wis.App. 1985); and New Jersey: State v. Kirk, 202 N.J. Super. 28, 493 A.2d 1271 (1985); State v. Novembrino, 200 N.J. Super. 229, 491 A.2d 37 (1985). The Novembrino court perceptively observed that nothing less than "the integrity of the criminal justice process" is placed in jeopardy in Leon. 491 A.2d at 45. This is particularly so in a state like Mississippi where most judges issuing search warrants have had no formal legal training. See footnote 6, supra.
The Court of Appeals of Idaho has persuasively demonstrated that, once Gates v. Illinois had been decided, Leon was simply unnecessary. State v. Schaffer, 107 Idaho 812, 693 P.2d 458 (Idaho App. 1984). With incisive perception, the Idaho court concluded
For the vast majority of situations, it would appear that the Supreme Court in Gates and Leon has killed one bird with two stones. [Emphasis added]
693 P.2d at 468.
We reiterate the fundamental logic of the exclusionary rule. Enforcement of the rule places the parties in the position they would have been in had there been no unlawful search and seizure. It restores the status quo. If the state had not conducted the illegal search, it ordinarily would not have the evidence it seeks to use against the defendant at trial.[8] All the exclusionary rule does is to send the case to trial with prosecution and defense in the posture each would have been in had there been no violation of the defendant's constitutional right to be free of searches made pursuant to warrants issued without probable cause. Nix v. Williams, 467 U.S. 431, 441-443, 104 S.Ct. 2501, 2508-09, 81 L.Ed.2d 377, 386 (1984). Nothing in Leon tells us what is wrong with this view of the rule.
There may well have been a time in our recent past when the search and seizure law in this state had become unnecessarily formalistic and impractical. The two-pronged test for probable cause derived from Aguilar and Spinelli may have been a bit artificial, although we faithfully enforced it from O'Bean to Strode to Read  so long as we perceived that we were required to do so. Gates v. Illinois, as explained above, has inaugurated a more practicable and workable standard for probable cause determinations  the totality-of-the-circumstances test  which we have in turn embraced in Lee and Hall, and progeny, although we were not obligated to so construe our Section 23 had we not wished to. Penick v. State, 440 So.2d 546, 551-52 (Miss. 1983). The thirteen year period just mentioned during which we have vitiated only one search warrant occurred during the ascendancy of the now defunct Aguilar-Spinelli test.
*851 A second step has recently been taken by this Court to assure that probable cause determinations are made in a fair and reasonable manner. At issue in such cases is the existence vel non of probable cause, not the officer's skill in preparing an affidavit for search warrant. Recognizing this, we have held that, both before the issuing magistrate and reviewing court, specific facts presented orally to the magistrate or otherwise extraneous to the affidavit may be considered. Lee v. State, 435 So.2d 674, 677 (Miss. 1983); Read v. State, 430 So.2d 832, 834-35 (Miss. 1983); Wilborn v. State, 394 So.2d 1355, 1357 (Miss. 1981).
A combination of our adoption of the Gates totality-of-the-circumstances test and the supplemental oral testimony rule is sufficient unto this day. With these adjustments, we have in this state a criminal justice system capable of vindicating the public's interest in effective detection and prosecution of offenders consistent with respect for the guarantee of Section 23 of our Constitution that
the people shall be secure in their persons, houses, and possessions, from unreasonable seizure and search; and no [search] warrant shall be issued without probable cause, ... .
The exclusionary rule has been a viable part of the criminal constitutional procedural jurisprudence of this state for at least sixty years. I perceive neither a need for change nor a reasonably effective and available alternative. Indeed, fact and reason suggest that we retain our present rule. In the enforcement of rights secured by Section 23 of our Constitution, we should eschew any allegiance to Leon.
I would hold that, by virtue of the positive law of this state, where at a suppression hearing the State fails to establish, via specific facts and circumstances presented to the issuing magistrate, either in the affidavit for search warrant or in supplemental oral testimony, that under the totality of the circumstances there was probable cause for the issuance of the search warrant, the things seized by the officers by virtue of the authority purportedly conferred by the warrant may not be received into evidence at trial. Having held that the warrant in this case was issued without probable cause, I would hold that the Circuit Court erred in receiving into evidence the long-barrel shotgun and the short-barrel shotgun case.
PRATHER and SULLIVAN, JJ., join in this opinion.
GRIFFIN, J., not participating.
NOTES
[1] No one contends that this long-barrel shotgun was one of the murder weapons. It was offered by the State to enable Rhonda Brock to explain to the jury the kind of gun Jimbo Stringer wielded on the night in question.
[2] At trial the initial defense objection to these two exhibits was on grounds of relevancy, followed by the lack of probable cause objection. Upon the exclusion of the jury, the sole ground argued and in support of which evidence was presented was lack of probable cause. The trial judge merely overruled the defense objection. On this appeal receipt of these exhibits into evidence is assigned as error on the ground that there was no probable cause to support the issuance of the warrant or the search and seizure. The relevancy question has not been assigned, briefed or argued. Assuming, without deciding, that the State's tender of the long-barrel shotgun was objectionable on relevancy grounds (because no one suggests it was the actual murder weapon), the short-barrel shotgun case would survive such an objection. It is probative of the idea that the accused owned a weapon fitting the description of the never produced actual murder weapon. For these reasons, we should proceed with the assignment regarding admission of these two exhibits on probable cause grounds and not on relevancy grounds.
[3] In determining whether an individual has consented to a warrantless search, we also follow a "totality of the circumstances" test. Luton v. State, 287 So.2d 269, 273 (Miss. 1973).
[4] Reading Leon reveals the above proposition as a purposeful, calculated action of the majority. The criticism reasonably to have been anticipated upon the Supreme Court's modification of the exclusionary rule could be blunted if the rule were seen as being of something less than constitutional stature.
[5] See also State v. Arrington, 311 N.C. 633, 319 S.E.2d 254, 260-61 (1984) (North Carolina court construing state constitution "is not bound by opinions of the Supreme Court of the United States construing even identical provisions in the Constitution of the United States"). A most eloquent expression of this view may be found in State v. Jewett, 500 A.2d 233, 235 (Vt. 1985) ("[Our state constitution] is our birthright which we have sold for a bowl of federal porridge.")
[6] The cost-benefit analysis and the answers it may provide to the efficiency question are appropriately considered at the pre-law-making stage. The notion that we ought enforce vested rights only where the benefits of so doing would outweigh the costs is wholly alien to our Anglo-American legal tradition wherein rights have been though subject to compromise only when they collide with conflicting rights vested in others. See In Re Brown, 478 So.2d 1033, 1036-37 (Miss. 1985). Cases like Leon are defensible only if we are prepared to rename the first ten amendments the "Bill of Interests".
[7] Consider the disturbing judicial deference to a law enforcement request for a warrant in McCommon v. State, 467 So.2d 940, 942-45 (Miss. 1985), cert. den. ___ U.S. ___, ___, 106 S.Ct. 393, 394-96, 88 L.Ed.2d 345, 346-88 (1985) (Brennan, J., dissenting).
[8] The Supreme Court of the United States has recently recognized an exception, not relevant here, to the conclusion stated above for cases in which in the normal course of events law enforcement officers would have "inevitably discovered" the controverted items of evidence by lawful means. Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).