## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 92-KA-00003-SCT

*LOIS W. RHODES*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/23/91 |
| TRIAL JUDGE: | HON. CLARENCE E. MORGAN |
| COURT FROM WHICH APPEALED: | WINSTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | SAMUEL H. WILKINS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEWITT T. ALLRED, III |
| DISTRICT ATTORNEY: | NA |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 6/20/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 8/1/96 |

**EN BANC.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. This murder case presents the always perplexing circumstance that the victim and the accused were the only persons present when the wrongful act is alleged to have occurred. Further complicating this case is that the prosecution did not ensue until many years after the event. In the end, the question is whether there was sufficient evidence upon which a reasonable rational fact-finder could conclude that the defendant was guilty beyond a reasonable doubt. We conclude that there was and find no other error requiring reversal. Accordingly, we affirm.

I.

¶2. Wirt Henry Rhodes (a/k/a "Bud") died of multiple gunshot wounds on June 29, 1982. Without the benefit of an autopsy, his death was determined at the scene to be death by suicide. Rumors concerning the cause of Mr. Rhodes' death began to surface approximately nine years later to the effect that James Winstead (Lois Rhodes' brother) had been called by Lois Rhodes late in the night of the death of Bud Rhodes; that James Winstead had gotten up, left home, gone to Winstead Construction and picked up new carpet, gone out to the Rhodes house, replaced the carpet, wiped the blood off of the wall, rolled Bud Rhodes in the carpet, taken him outside, and then brought him

back in with the new carpet.

¶3. An investigation into the death of Mr. Rhodes was later conducted and on June 29, 1982, Lois Rhodes, Mr. Rhodes' wife, was indicted by the Grand Jury of Winston County for Mr. Rhodes' murder.

¶4. Dr. Lloyd White, a state medical examiner, testified at trial. The following is a summary of his testimony. In March or April of 1991, Mr. Rhodes' body was exhumed. White did an autopsy on the body to resolve questions pertaining to the alleged suicide. He examined the coffin and found a bullet at the bottom which he described as a large gray metallic (lead) unjacketed bullet. The corpse was totally skeletonized and decomposed. While examining the body, he found a bullet embedded below and behind the mastoid process on the left side of the skull (mastoid bullet). He described the bullet as probably a .38 unjacketed bullet. The wound created by this bullet was immediately incapacitating and quite probably fatal. He described the mastoid as a large projection of bone behind the ear called the temporal bone. The bullet was embedded in the outer layers of the skull and had not entered into the cranial cavity. The bullet could not have entered from the neck and ended up in the skull as the defense asserts because all of the bony structures under the surface of the skull were completely intact. In addition, there was no damage or defect to the front of the temporal bone. A bullet does not pass through a solid object without leaving some evidence that it has passed through. In addition, the cervical vertebra, defined by Dorland's Illustrated Medical Dictionary, 24th ed. (1965), as the upper vertebra constituting the skeleton of the neck, were undamaged other than normal postmortem changes. He could not imagine any way for the bullet to have gotten embedded in the mastoid, except by coming from directly below and behind the mastoid. He also observed the right temple wound. This wound was also immediately incapacitating and fatal. Since the neck tissue was decomposed and the wound tissue was no longer present and available for viewing, he could not testify to the existence of a neck wound. He testified that although people do shoot themselves multiple times, he did not believe that either the mastoid wound or the temple wound were self-inflicted because people do not inflict one incapacitating or fatal wound and then inflict another. Although Mr. Rhodes could have survived the neck wound and could have thereafter inflicted one of the incapacitating wounds, he could not have inflicted a third incapacitating wound because to do so would have required a "resurrection."

¶5. Dr. Edward Waldrip, an anthropologist with a specialty in skeletal anatomy and skeletal identification, also testified at trial on behalf of the State and supported Dr. White's testimony.

¶6. Dr. Page Hudson and Dr. John Smialek, both specialists in forensic pathology, testified on behalf of the defense. In their opinion, a review of witness' statements who were at the scene of the death, the autopsy report, Dr. Waldrip's report, toxicology tests, preliminary hearing testimony, x-rays, bony remains of the body, and a diagram of Mr. Rhodes' house revealed that only two shots were fired to the right side of Mr. Rhodes' head and both were self-inflicted. They theorized that a bullet to the neck traveled in an upward direction. It struck the transverse process of the cervical vertebra, broke it off, and became embedded in the left mastoid area. Thus, the mastoid bullet was, in fact, the bullet which had inflicted the wound to the neck. Hudson testified that the bullet left a trail of small lead particles as it traveled in the upward direction. He further stated that the cap of the mastoid bone had been knocked off in several pieces and glued back together in a manner which concealed the bullet's track. In addition to the neck wound, both doctors testified that Mr. Rhodes suffered a temple

wound.

¶7. Dr. James Giffin, a medical doctor practicing in Louisville and employer of Rhodes, also testified at trial. Rhodes had worked for him for over thirty years as a bookkeeper, secretary, and receptionist. After the shooting, Rhodes called him at the hospital and informed him that she thought Mr. Rhodes shot himself. She informed him that she went to her barn to feed horses during which time she heard two shots. She went back to the house and saw Mr. Rhodes lying on the bedroom floor.

¶8. Rhodes' rendition of the event was similarly testified to by Toby Wilson, an emergency medical technician employed at the Winston County Community Hospital, and Sheriff Cecil Jennings. A somewhat different version of the event was testified to by Rhonda Haggard, a close friend of the Rhodes family, who stated that Rhodes informed her that she heard a shot after she fed the horses and was headed toward the house. She started running down the hall and saw that Mr. Rhodes had a gun to his head. She yelled "Bud, don't" and Mr. Rhodes pulled the trigger. June Eskridge, Mr. Rhodes' sister, testified to being told this same version of the events.

¶9. Upon viewing the body at the house, Giffin saw the right temple wound and the neck wound. He noticed that the neck wound began on the right of the centerline of the neck and created a crease or furrow going in an upward direction in an angle toward the left ear. He did not observe anything from a medical standpoint that would indicate that the wounds were in any way caused by a third party. Giffin's testimony was supported by Toby Wilson, the emergency technician, George Westbrook, Winston County Coroner, Phillip Gillis, Westbrook's assistant, and Roy Ryals, insurance agent for Equitable Life Assurance Society, all of whom testified to observing Mr. Rhodes' body soon after the shooting.

¶10. Sheriff Cecil Jennings, Sheriff of Winston County at the time of the shooting, also testified at trial. He recalled that when he arrived at Rhodes' house, he observed the body lying face down. He turned Mr. Rhodes over, examined him with his hands and observed the neck wound, the temple wound and, when Mr. Rhodes was cleaned up, he observed a small "bursted out place" to the left of the center of his head where it appeared that something had come out.

¶11. Jennings' testimony that he examined the body was contradicted by Wilson, who testified that he was in the room the entire time Jennings was in the room while the body was present, and Jennings never examined the body.

¶12. Sheriff Jennings concluded that the death was caused by self-inflicted gunshot wounds, and there was nothing at the scene that suggested that the shots were fired by someone else. An autopsy was not done on the body because after examining it in the presence of the coroner, the coroner's jury, and Dr. Giffin, he asked whether anyone thought an autopsy was necessary, and Dr. Giffin said no because it was a suicide. No one objected.

¶13. Sheriff Jennings found a .38 Smith and Wesson semi-automatic pistol lying three or four inches from Mr. Rhodes' right hand. He found two fired bullets and four unfired hollow-point bullets when he opened up the cylinder. The trial court admitted a gun into evidence, and Jennings testified that it was not the gun he found next to the body. The gun at the scene had a four inch barrel, the gun introduced by the State was a snub-nosed gun with a very short barrel. William Metts, Rhodes' son-in-law, was also present at the house after the shooting and testified that the gun introduced by the

State was not the gun that Jennings had at the scene. He stated that the gun at the scene was a blue steel gun with a wood handle; the gun introduced by the State had a lighter handle on it.

¶14. The gun admitted into evidence was the subject of a pre-trial motion in limine by the defense, who argued that the gun was found over nine years after Mr. Rhodes' death, had no connection with the death and, thus, was irrelevant. The motion was denied on the basis that the court had no way of knowing whether the gun had any connection to the death. It was also the subject of a motion in limine at trial. The motion was overruled because the court found that no gun was ever identified as being the gun that actually shot Mr. Rhodes, including the gun found lying next to his body. Furthermore, the court found that there was testimony that the gun admitted into evidence could have caused the wound. Thus, whether the gun admitted into evidence was the gun that caused Mr. Rhodes' death was a jury question.

¶15. In June of 1989, Donna Black purchased the home in which the Rhodes family resided. She testified that during the time Dr. Giffin was called to testify before the grand jury regarding this case, Rhodes phoned her and requested a meeting at Dr. Giffin's office. When they met, Rhodes informed her that there was a gun in the attic of Black's house that belonged to her son's father. She stated that her son would like to have it back and that it had nothing to do with Mr. Rhodes' death. Black was told to put it in a paper sack and take it to Rhodes at the office. Rhodes told her that the gun was in the attic under some insulation "because there were small children around her house and after Bud's death she did not want any guns around for the small kids to get a-hold of." Rhodes also told her not to mention the conversation to anyone, including her husband. Black thereafter told her husband who found the gun, wiped his fingerprints off of it, and put it back under the insulation. She later told Rhodes that she was scared of guns, that she wasn't going to touch the gun, and that Rhodes could retrieve the gun if she wanted to do so. Later, she called George Beckett, a private investigator and informed him of the situation. Beckett removed the gun from the attic.

¶16. George Beckett, criminal investigator for the District Attorney's office, testified at trial. He testified that nine years after Mr. Rhodes' death, Black contacted him regarding her conversation with Rhodes. Upon entering her attic, he found a revolver. The gun had three empty rounds and three loaded rounds. He took the bullets out and placed them in a pillbox.

¶17. John Allen, forensic scientist with the Mississippi Crime Laboratory, testified that the mastoid bullet was a .38 caliber semi-jacketed bullet. This bullet bore the same class characteristics as those produced by the firearm found in the attic. However, there was insufficient evidence to either include or exclude it as having been fired by the attic revolver. He also testified that the bullet found in the coffin was a .38 round-nose lead projectile. He could not include or exclude that bullet as being fired from the gun found in the attic.

¶18. Without an objection, the State introduced an insurance policy into evidence that Rhodes purchased on Mr. Rhodes' life. The amount of the policy was $100,000, and listed Rhodes as the owner and beneficiary. The policy included a double indemnity clause in the case of accidental death and had a suicide exclusionary clause. Although the policy appears to be irrelevant in the present case because the death of Mr. Rhodes was made to look like a suicide and, thus, would not pay off in the present case, the State presented evidence that Rhodes attempted to kill Mr. Rhodes the day prior to his death and attempted to make it look like an accidental death. Through witness testimony, the

State showed that the couple had a turbulent relationship with infidelity problems and threats of divorce. The State's evidence revealed that Mr. Rhodes drove to Dr. Giffin's office to visit with Rhodes, had a drink, and may have received a shot from Rhodes, believing that it was for his hay fever. He got back in his car and started driving, during which time he became dizzy. Though Mr. Rhodes received medical attention for his symptoms, however he was not tested for antihistamines and it was not determined what actually caused his symptoms. Upon exhumation of his body, the antihistamines chlor-trimeton and benadryl, neither of which could be purchased over the counter at the time, were discovered in his system and testimony at trial indicated that they could have caused his symptoms. The State lead the jury to infer that Rhodes may have given him shots of benadryl and chlor-trimeton, or laced his drink with the drugs, which thereafter caused him to experience dizziness and fatigue while driving his car. To contradict this testimony, the defense put on testimony evincing that Mr. Rhodes' symptoms were caused by toxicity directly related to a Cambridge diet that he was on.

¶19. The court informed Rhodes of her right to testify. She stated that she understood her rights and indicated that she waived this right.

¶20. At the close of the State's case, and after the defense rested, the defense unsuccessfully moved for a directed verdict arguing that the State failed to make a prima facie case connecting Rhodes with Mr. Rhodes' death. At the close of its case, the defense also unsuccessfully moved for a judgment notwithstanding the verdict and unsuccessfully made a motion for new trial, arguing that the proof was insufficient to create a question on the issue of guilt, and that the verdict was based on suspicion, conjecture and speculation. Rhodes was found guilty of murder and sentenced to life imprisonment.

## II.

¶21. Rhodes contends that viewing the evidence as a whole as required by this Court in **Strong v. State**, 600 So. 2d 199 (Miss. 1992), there was insufficient evidence upon which a reasonable person could find beyond a reasonable doubt that she murdered her husband with malice aforethought. She argues that the State created a scenario in which she over medicated her husband, then shot him in the back of the head in the left mastoid process and faked his suicide as the result of his infidelities and threats of divorce. She argues that there were only two bullet wounds to Mr. Rhodes' body, both self-inflicted, a neck wound and a temple wound. In support of her argument, she asserts that Dr. Giffin, Sheriff Jennings and coroner George Westbrook were all present at the scene, had firsthand knowledge of the events, examined the body, unanimously testified that there was no third bullet wound in the left mastoid process, and that the physical evidence was consistent with a suicide.

¶22. Rhodes argues that although the State presented experts who testified that the third bullet wound was embedded below and behind the left mastoid process, indicating that someone shot Mr. Rhodes from the left rear, defense experts Dr. Smialek and Dr. Hudson both testified that the bullet embedded in that region was, in fact, the bullet which entered the neck as evinced by the damage to the bony process in the first cervical vertebra and the broken mastoid bone. She argues that both defense experts believed that only two bullets were involved and the wounds were self-inflicted.

¶23. In addition, Rhodes contends that she had nothing to do with the severe mental changes that Mr. Rhodes experienced on the day prior to his death, and argues that her position is supported by expert testimony indicating that Mr. Rhodes suffered from severe toxic symptoms directly related to his

Cambridge diet.

¶24. The State contends that the proof evinces that Mr. Rhodes' death was a homicide, not a suicide. It contends that Rhodes has made no showing that it would have been unreasonable for jurors to accept the opinions of the State's experts rather than Rhodes', and thus, she made no showing that her experts' testimony should have been accepted. **Henry v. State**, 484 So. 2d 1012, 1015 (Miss. 1986) (a jury is fully capable of deciding which of two experts is more credible). In addition, the State contends that Rhodes has made no showing that the jury verdict was contrary to the overwhelming weight of the evidence, thus, she is not entitled to reversal of her conviction. *Flowers v. State*, 601 So. 2d 828, 833 (Miss. 1992).

¶25. The State argues that the jury verdict is supported by scientific evidence and surrounding circumstances. Relying upon the testimony of Drs. White and Waldrip, both of whom observed a temple wound and a wound to the left mastoid process, the State asserts that Mr. Rhodes was murdered. In support of its position, the State illuminates Dr. White's and Dr. Waldrip's testimony that the mastoid wound was a wound independent of the neck wound as evinced by fragmentation in the back of the skull rather than in the front. According to White, the temple wound and the mastoid wound were immediately incapacitating, thus, the defendant could not have self-inflicted one wound and then inflicted the other. The State further argues that the third uncontested neck wound was testified to by a number of witnesses including Dr. Giffin, Sheriff Jennings, George Westbrook, Phillip Gillis and Roy Ryals. Thus, the evidence indicates that Mr. Rhodes was shot three times rather than twice.

¶26. The State further asserts that although Rhodes relies on the testimony of Dr. Giffin, Sheriff Jennings, and George Westbrook for the assertion that there were only two wounds, the jury could have justifiably rejected their testimony on various grounds. Dr. Giffin neither touched Mr. Rhodes' head, took measurements, probed wounds, nor cleaned away any blood to see where the wounds were located. The State asserts that the jury would have been justified in believing that Dr. Giffin's opinion was not based on a professional examination, but "upon a hear-no-evil-see-no-evil desire to avoid doing anything that would interfere with his preformed conclusion that his long-time nurse, associate and friend had not murdered her husband." Furthermore, although Sheriff Cecil Jennings testified that he examined the body with his hands, the State noted that his testimony was contradicted by Toby Wilson, who testified that Jennings' never examined the body.

¶27. The State further asserts that Rhodes' actions on the day Dr. Giffin testified before the grand jury were factors that the jury considered and add weight to the evidence proving Rhodes' guilt. The State cites Black's testimony that Rhodes called her, asked her to retrieve a pistol from the attic of the house in which Mr. Rhodes was killed, and asked her to give it to her at Dr. Giffin's office without telling anyone.

¶28. Moreover, the State argues that the evidence indicates that Rhodes may have attempted to kill Mr. Rhodes on the day prior to his death. The State contends that Rhodes had the opportunity to administer Mr. Rhodes antihistamines, that she had the motive to kill him because she was the beneficiary of an insurance policy that carried double indemnity clauses in the event of accidental death, and that she knew Mr. Rhodes was going to operate his motor automobile after he left Dr. Giffin's office.

¶29. Viewing the evidence presented as a whole, the State contends that reasonable jurors could find that Rhodes killed her husband.

¶30. Rhodes' contention that the jury verdict is against the overwhelming weight of the evidence is without merit. When, as here, the State's case is based entirely upon circumstantial evidence, the State must prove the defendant guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. **Montgomery v. State**, 515 So. 2d 845, 848 (Miss. 1987). In addition,

> [w]hen reviewing a jury verdict of guilty we are required to accept as true all the evidence favorable to the State, together with reasonable inferences arising therefrom, to disregard the evidence favorable to the defendant, and if such will support a verdict of guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence, then the jury verdict shall not be disturbed. **Hester**, 463 So. 2d at 1091, **Carrol v. State**, 396 So. 2d 1033, 1035 (Miss. 1981).

**Montgomery**, 515 So. 2d at 848.

¶31. Accepting the evidence favorable to the State as true, together with reasonable inferences, the circumstantial evidence presented is sufficient to support the jury verdict. Evidentiary factors lending support to the jury verdict include the following: Rhodes was the only other person home when the shots were fired and she proclaimed that Mr. Rhodes committed suicide by shooting himself twice, once to the throat and once to the temple; an autopsy of the body revealed, and experts testified, that Mr. Rhodes was shot a third time in the left mastoid process below and behind the left ear indicating that the shot was not self-inflicted; the temple wound and the mastoid wound were immediately incapacitating and fatal, thus, Mr. Rhodes could not have self-inflicted one shot and then self-inflicted the other; during the period this case was being heard before the Grand Jury, Rhodes asked an individual residing in the home where the shooting occurred to retrieve a gun from the attic; the bullets found in the mastoid process and Mr. Rhodes' coffin bear the same characteristics as those produced by the firearm found in the attic and could not be included or excluded as having been fired from that revolver; the fact that three bullets were missing from the firearm was consistent with the theory that Mr. Rhodes suffered three bullet wounds.

¶32. Because the evidence viewed in the light most favorable to the verdict indicates that Mr. Rhodes was murdered, indicates that Rhodes was the only other person at the scene by her own admission, and evinces that she had dominion and control over a firearm that could not be excluded as having caused the fatal wounds, the evidence is sufficient to support the guilty verdict, and thus, her assignment of error is without merit.

### III.

¶33. Rhodes argues that the gun that was retrieved from the attic (attic revolver) was unrelated to the crime, irrelevant, and should not have been admitted into evidence. She further argues that its admission into evidence over her objections and motions in limine was prejudicial, thus a new trial is warranted. *Wade v. State*, 583 So. 2d 965, 967 (Miss. 1991) (child sex abuse case where bag of sexually explicit pictures held improperly admitted into evidence where the children were not shown the pictures and thus they were neither relevant to the battery nor the res gestae of the crime).

¶34. Rhodes asserts that the gun which killed Mr. Rhodes was removed from the scene by Sheriff Jennings and was never introduced into evidence. She asserts that she was prejudiced when the attic revolver, retrieved nine years after the incident, was introduced at trial without the State contending that it was the gun that caused the death and without any witnesses testifying to that effect.

¶35. Moreover, Rhodes contends that the attic revolver was irrelevant because the finding of the revolver was remote in time and place as it was found nine years after the incident, and there was no evidence indicating that the gun was in existence or available to Rhodes at the time of the incident. As authority for this contention, Rhodes relies on *Wilkins v. State*, 264 So. 2d 411, 413 (Miss. 1972); *Stringer v. State*, 491 So. 2d 837, 840 (Miss. 1986); and *Lanier v. State*, 291 So. 2d 695 (Miss. 1974).

¶36. In *Wilkins,* this Court held that the trial court did not abuse its discretion in a burglary case by allowing an ax found one hundred feet from where the defendant was apprehended into evidence when an ax was used to commit the burglary. *Wilkins*, 264 So. 2d at 411. This Court held that evidence as to the condition of the crime scene and objects found at the scene are admissible if relevant and not remote in time and place. Furthermore, this Court held that it is within the discretion of the trial judge to determine whether burglary tools found near the scene of a burglary are near enough in time and place to be of probative evidentiary value.

¶37. In *Stringer*, a 30-inch barrel shot gun was admitted into evidence in a homicide case. **Stringer**, 491 So. 2d at 837. This Court held that the gun should not have been admitted into evidence because it was irrelevant where the deceased was killed with a shortened barrel "riot" shotgun.

¶38. In **Lanier**, the defendant sought to admit shotgun shells and cartridges belonging to a murder victim in a homicide case where the victim was killed with a knife by his defendant girlfriend, and the girlfriend testified that the deceased previously threatened to kill her with the shotgun. **Lanier,** 291 So. 2d at 695. This Court held that the shells and cartridges were inadmissible because there was no evidence to indicate that a shotgun was used in the altercation. Furthermore, this Court reasoned "the mere finding of a rifle or other articles owned or in the possession of a defendant or deceased, wholly disconnected with the issue before the court, is properly excluded from the evidence before the jury." **Id**. at 696.

¶39. The State contends that the essential inquiry as to whether the gun was admissible is whether it was relevant, and not simply whether it was found in a remote time and place. Furthermore, it was unnecessary to conclusively demonstrate that the attic revolver was actually used in the homicide prior to its admittance in evidence, argues the State. To the contrary, the State asserts that it was proper to establish a connection between Rhodes and the revolver during trial, and to demonstrate that the revolver could have caused the fatal wounds. As authority for these contentions, the State relies on **Ethridge v. State**, 418 So. 2d 798 (Miss. 1982); and **Stokes v. State,** 518 So. 2d 1224 (Miss. 1988).

¶40. In **Ethridge**, error was assigned to the trial court in the admission of two .38 caliber pistols found in the appellant's home where the decedent was killed. **Ethridge**, 418 So. 2d at 798. Although neither of the guns were proven to be the murder weapon, a pathologist testified that the decedent was shot with a handgun of mid-caliber size consistent with the size of a .38 caliber bullet. This Court

held:

> It was competent to show that the appellant owned a .38 pistol or pistols, since the evidence of the fatal wound indicated it was similar in size to a wound caused by that size bullet. The introduction of the pistols, under the facts of this case, was relevant to proof of the fatal wound and had probative value as to the connection of appellant with the homicide.

**Id.** at 800.

¶41. In **Stokes,** the defendant left his companions to walk a woman home. **Stokes**, 518 at 1224. He later returned to his companions and informed them that somebody "got" the woman. The defendant retrieved the victim from a water-filled ditch and took her to the hospital where she was pronounced dead on arrival. An autopsy report indicated that she received a blow to the head sufficient to render her unconscious and unable to remove herself from the water. A pair of pliers was retrieved from the defendant at the hospital and was admitted into evidence at trial. This Court held that although there was no evidence that the pliers were used to strike the victim, it was proper for the State to introduce them because there was competent evidence to show that pliers could have caused the victim's head injury.

¶42. In addition, the State contends that the testimony indicates that the bullet retrieved from the mastoid process bears the same class characteristics (semi-jacketed, hollow point) as those produced by the attic revolver. Furthermore, there was evidence that the bullet found in the coffin could neither be excluded nor included as having been fired from the attic revolver. Moreover, the attic revolver was a six-shot revolver and had three unfired cartridges, which was consistent with having fired three bullets, to wit: the mastoid bullet, the coffin bullet, and the neck bullet.

¶43. Additionally, the State argues that Rhodes' request that Black retrieve the gun from the attic on the very day that the case was presented to the grand jury evinces a strong and direct connection between the gun and the death.

¶44. Rhodes' contention that the trial court erred in admitting the attic revolver into evidence is without merit. As the State contends, it was unnecessary for the State to demonstrate that the revolver was actually the gun that caused Mr. Rhodes' death prior to its admission. In **Ethridge,** 418 So. 2d at 798, and **Stokes,** 518 So. 2d at 1224, this Court allowed weapons into evidence where there was competent evidence that the weapons could have caused the injuries, and where there was some connection between the defendant and that weapon. As in those cases the revolver here could have caused the death. The connection between it and Rhodes is evidenced by Rhodes' dominion and control over the revolver when she placed it in the attic and thereafter requested that Black retrieve the revolver and bring it to her.

¶45. Rhodes' reliance on **Lanier**, 291 So. 2d at 695, and **Stringer**, 491 So. 2d at 837, is misplaced. In those cases, unlike the present case, there was no evidence that the weapon sought to be admitted could have caused the victims injuries.

¶46. Rhodes' reliance on **Wilkins**, 264 So. 2d at 411, for the proposition that the gun was inadmissible because it was found in a remote time and place also must fail. In **Stewart v. State,** 226 So. 2d 911 (Miss. 1969), this Court held that the determination of whether evidence is too remote to

be relevant is within the discretion of the trial judge, and his decision will not be reversed in the absence of a clear indication that he abused his discretion. *Johnson v. State*, 655 So. 2d 37, 43 (Miss. 1995); *Robinson v. State*, 595 So. 2d 1310, 1315 (Miss. 1992). In **Stewart** this Court held that prior threats and provocations by the defendant toward the victim six months before a shooting were properly excluded because the prior difficulties were too remote in time. Thus, the essential question is whether the trial judge in the present case abused his discretion in finding the gun relevant and admitting it into evidence.

¶47. Because there was evidence that the gun could neither be included or excluded as the weapon that caused Mr. Rhodes' death, and that Rhodes exercised dominion and control over the gun by placing it in the attic, there was sufficient proof that the gun was relevant. Thus, the trial court did not abuse its discretion by admitting the gun into evidence.

## IV.

¶48. Rhodes contends that defense counsel should have objected to the admission of the insurance policy and to Ryal's testimony that Rhodes purchased the $100,000 policy on her husband which listed her as the owner and beneficiary. Rhodes contends that the policy was irrelevant because the policy contained a suicide exclusionary clause that she was aware of, and because she never made a claim against the policy. Because this evidence was irrelevant, carried the inference that she plotted the demise of her husband weeks in advance of his death, and created the inference that she intended to profit from his death, Rhodes asserts that failure to object to such evidence constituted inadequate and ineffective representation.

¶49. This contention answers itself. The policy was relevant to the state's theory that Rhodes intended to kill Mr. Rhodes and profit from it by setting him up for an accident. When that failed, she proceeded to rid herself of him and make it appear to be a suicide. It follows that an objection to the evidence would have been of no avail and the failure to do so cannot be ineffective assistance. Moreover, the inference that the state sought is not the only inference to be drawn. Counsel could and did argue that Rhodes' profit motive was obviated by the suicide clause and that therefore she had no motive at all to kill Mr. Rhodes in the manner alleged.

¶50. In addition, Rhodes contends that counsel's failure to place her on the stand to testify constituted ineffective assistance of counsel. She asserts that under **Weathersby v. State**, So. 165 Miss. 207 (1933), the jury would have been required to accept her version of the circumstances surrounding Mr. Rhodes' death if she had testified because she was the only person present at the time of Mr. Rhodes' death and was the only person with first-hand knowledge of the circumstances surrounding the shooting. Rhodes overlooks the fact that she personally waived her right to testify. Moreover, the fact is that Rhodes' version of events was already before the jury such that any benefit to be derived from the so-called *Weathersby* rule was not lost. The advice that she not testify under these circumstance was an acceptable strategic decision. It is certainly not shown as ineffective on this record. **Strickland v. Washington**, 466 U.S. 668, 689-690 (1984).

## CONCLUSION

¶51. Because the guilty verdict is supported by the evidence, the attic revolver was properly admitted into evidence, and Rhodes has failed to prove defense counsel's performance deficient, this Court

affirms Rhodes' murder conviction.

¶52. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**PRATHER AND SULLIVAN, P.JJ., PITTMAN, ROBERTS, SMITH AND MILLS, JJ., CONCUR. LEE, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, J. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY LEE, C.J.**

### DAN LEE, CHIEF JUSTICE, DISSENTING:

¶53. The trial court committed reversible error when it allowed the State to introduce irrelevant evidence at trial. The admission of the .38-caliber snub-nose revolver into evidence unfairly prejudiced Lois Rhodes' defense and allowed the jury, through impermissible speculation and conjecture, to surmise that the revolver in question was used by Lois to shoot Bud Rhodes. The evidence adduced at trial does not support such conjecture and, accordingly, I respectfully dissent.

¶54. We have defined relevant evidence as that which tends to show whether a fact of consequence to an action occurred *vel non*. *Collins v. State*, 513 So. 2d 877, 878 (Miss. 1987); *Foster v. State*, 508 So. 2d 1111, 1117 (Miss. 1987). *See also* Miss. R. Evid. 401 (**relevant evidence is evidence that has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable**). The decision whether to admit evidence is left to the sound discretion of the trial judge. *Wade v. State*, 583 So. 2d 965, 967 (Miss. 1991) (citing *Brown v. State*, 534 So. 2d 1019, 1024-25 (Miss. 1988)). Ordinarily we will not overturn the lower court's introduction of evidence unless the evidence unfairly prejudices the defendant. *Collins*, 513 So. 2d at 879 (citing *Lambert v. State*, 462 So. 2d 308, 312 (Miss. 1984)).

¶55. In the case *sub judice*, the prosecution pressed its expert witness, John Allen, as to whether he could say that the disputed revolver fired the bullets removed from Bud Rhodes' body and casket:

> Q. **Can you include or exclude the bullet in 11-B as having been fired in the revolver 1-A?**
>
> A. **No, sir, I could not.**
>
> Q. **You cannot include it? Is that correct?**
>
> A. **I could not include it or exclude it.**

Clearly, the State's own firearms expert could not include the disputed revolver as having fired the bullets, nor could he exclude the revolver as having fired the bullets. That is, he could not testify that it was **more probable or less probable** that the disputed gun was used to kill Bud Rhodes.

¶56. In *Foster v. State*, we found that it was error for the State's expert to say that a specific knife found at the crime scene **could have** caused the fatal wound. 508 So. 2d at 1118. Chief Justice Walker writing for the majoritity stated:

> [t]he majority of the Court however, is of the opinion that the trial court abused its discretion in

admitting these two (2) items of testimony. Of particular concern to the majority is the phrase "could have." In the view of the majority, the use of that language, which connoted only a possibility, minimized the evidence's probative value and maximized its tendency to mislead the jury. The latter so outweighed the former that the admission of this testimony constituted an abuse of discretion.

On remand, the experts may testify, for example, that Foster's car seat cannot be excluded as the source of the paint chips found on the victim's clothing, or that the knife found in Foster's car is consistent with the fatal wound. Use of the terms "possible" and "could have" should be avoided.

*Id.*

¶57. In the case at bar, unlike *Foster*, the expert does not even go so far as to say that the revolver "could have" fired the bullets in question. Instead, Allen's response made it clear that he could not say whether it was more probable than not that the disputed revolver fired the bullets retrieved from Bud's body.

¶58. If we have defined relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence[,][(1)]" and John Allen has testified that he cannot include or exclude the gun as having fired the bullets retrieved from Bud, how then can we say that the gun is relevant evidence? Or, put another way, how can we say that it is more probable than not, based upon John Allen's testimony, that Lois Rhodes used the disputed revolver to murder Bud Rhodes? Simply put, we cannot. Thus, the revolver was not relevant evidence and the trial court committed reversible error in admitting the gun.

¶59. In an analogous case, we reversed a defendant's conviction for sexual battery when the prosecution offered into evidence five sexually-explicit magazines that were in no way connected to the crime for which the defendant was tried. *Collins v. State*, 513 So. 2d 877 (Miss. 1987). In *Collins* the defendant admitted that he had shown the two alleged victims one sexually-explicit magazine. *Id.* at 878. At trial the prosecution offered into evidence five additional sexually-explicit magazines. These magazines had been found in a drawer in the defendant's shed where the alleged sexual battery took place. However, there was no testimony from the defendant or from the alleged victims which would indicate that these magazines had been shown to the alleged victims. *Id.* at 879.

¶60. This Court reversed the defendant's conviction and held that the only reason the magazines were offered into evidence was to inflame the Yalobusha County jurors. *Id.* In the case *sub judice*, the very nature of the circumstances surrounding the discovery of the gun, *i.e.*, Lois calling Donna Black and asking to speak with her privately, Lois' concern about electronic listening devices being placed in her office, Lois' desire that Donna not tell her husband about the gun, etc., was highly inflammatory and prejudicial. *Collins v. State*, 513 So. 2d 877, 879 (Miss. 1987). Moreover, because of the lack of evidence connecting the bullets retrieved from Bud's body with the disputed revolver, any determination by the jury that Lois had used this particular gun to shoot Bud would have been based upon mere surmise or conjecture. This is unacceptable. *C.F.*, *Wilson v. State*, 639 So. 2d 1326, 1329 (Miss. 1994) (defendant not entitled to instruction on his theory of case when to give instruction would allow jury to reach verdict based on surmise and speculation).

¶61. Based upon the State's own expert testimony, we simply cannot say that this revolver was relevant to Bud's death. Moreover, the submission of the revolver and the surrounding testimony was highly inflammatory and unfairly prejudiced Lois Rhodes' defense. Therefore, the lower court clearly abused its discretion in allowing the jury to consider the revolver and the facts surrounding its discovery as evidence. *Wade*, 583 So. 2d at 967. Accordingly, I would reverse Lois Rhodes' conviction for murder and remand for a new trial.

**McRAE, J., JOINS THIS OPINION.**

**McRAE, JUSTICE, DISSENTING:**

¶62. I join Chief Justice Dan Lee's dissent and the reasoning therein for disallowing introduction of the gun as evidence, but write separately to emphasize that our role as an appellate court is to make sure that both parties receive a fair trial. The introduction of a gun found nine years after Bud Rhodes' death, coupled with a life insurance policy taken out by the accused on the decedent, but on which no claim was ever filed, served only to inflame and prejudice the jury, denying Lois Rhodes the opportunity for a fair trial.

¶63. The State's own firearms expert could not include or exclude the bullets removed from Rhodes' body as having been shot from the revolver found in the attic. After visually examining the gun and test-firing it, State Firearms Examiner, John M. Allen, stated in his Certified Laboratory Report:

> It is the finding of this examiner that the projectile in exhibit 1 and the projectile in exhibit 6 bears the same class characteristics as those produced by the gun in exhibit 7. However, due to insufficient individual characteristics, the projectile in exhibit 1 and the projectile in exhibit 6 could not be included or excluded as having been fired in the gun [i]n exhibit 7.

Thus, the State was unable to meet its burden of showing that the gun was relevant to its case against Rhodes and it should not have been admitted.

¶64. The majority's reliance on *Ethridge v. State,* 418 So. 2d 798 (Miss. 1982) and *Stokes v. State*, 518 So. 2d 1224 (Miss. 1988) is misplaced. As distinguished from the facts of those cases, the association between the gun found in the attic and either Lois or Bud Rhodes is too attenuated to have had any relevance at trial. In *Ethridge*, we found that guns found in the appellant's house where the victim was shot were "competent to show that the appellant owned a .38 pistol or pistols, since the evidence of the fatal wound indicated it was similar in size to a wound caused by that size bullet. The introduction of the pistols, **under the facts of this case**, was relevant to proof of the fatal wound and had probative value as to the connection of appellant with the homicide." *Id.* at 800 (emphasis added). The State, however, in the case *sub judice,* was not able to make such a conclusive connection between the weapon found in the attic and the bullets found in Rhodes' skull and coffin.

¶65. In *Stokes*, likewise, pliers found in the possession of the appellant when he and others brought the victim to the hospital were found to be admissible although "there was no proof that the pliers were used to inflict the injury to Jeanette . . . because there was competent evidence to show that a blow by the pliers **could have caused** the type of injury the pathologist observed on Jeanette's head."

*Id.* at 1227 (emphasis added). In contrast, in the case *sub judice*, the State's witness could not say for certain that the bullets which caused Rhodes' death came from the gun or the type of gun in question.

¶66. It further should be noted that no claim was ever filed to collect the proceeds on the insurance policy taken out by Lois Rhodes on her late husband, showing her as both owner and beneficiary. Since the statute of limitations for collecting on the policy long had passed by the time of trial, the existence of the policy was no longer relevant as to the issue of motive, and like the gun, served only to prejudice Rhodes' case.

¶67. Because of the admission of inflammatory, prejudicial evidence of questionable relevance, Lois Rhodes did not get a fair trial. This case should be reversed and remanded for a new trial.

**LEE, C.J., JOINS THIS OPINION.**


1. *Foster*, 508 So. 2d at 1117 (quoting Miss. R. Evid. 401).