BRIDGES, J.,
for the Court:
¶ 1. Jessie R. Pritchett was convicted of the crime of manslaughter by a Washington County jury. The court sentenced him to serve eighteen years in the custody of the Mississippi Department of Corrections. The court denied Pritchett’s motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial. We find that both the weight and sufficiency of the evidence against Pritchett justified his conviction and sentence and, therefore, affirm.
FACTS
¶ 2. The events surrounding Archie Pritchett’s death are reconstructed from testimony given at Jessie Pritchett’s trial. Seventy-five year old Archie Pritchett and his son, Jessie Pritchett, shared a trailer at Lot No. 7, Shady Acres Trailer Park in Washington County, Archie’s sons, Carl and David, lived in a converted bus located at Lot No. 62 in the same trailer park.
¶3. On June 3, 1996, Archie used a portion of his Social Security check to bail Jessie out of jail. As was often the case, family and friends were in and out of Archie’s trailer. During the course of the night of June 3 and early morning hours of June 4, Carl, David, Charles Anderson, Mark Box, Joseph Curaró, Kevin Terschell and Charlotte Bennett visited Archie and Jessie. Everyone was drinking heavily.
¶ 4. Carl testified he was the last visitor to leave Lot No. 7. When he left at approximately 2:00 a.m. on June 4, only Archie and Jessie remained at the trailer.
¶ 5. O.D. and Rosie Craft returned to their home at Lot 32 in Shady Acres about 2:00 a.m. on June 4. Lot 32 is approximately twenty feet from Archie’s trailer. As she was drifting off to sleep, Rosie heard a loud noise which Rosie described as “soundfing] like somebody was attacking somebody. And they were beating them and throwing them all upside the wall, throwing them all down on the floor.” The noise lasted about an hour.
*328 ¶ 6. The next morning an upset Jessie called Sheila Anderson telling her that Archie was dead. Sheila told her husband, Charles, that Jessie’s dad was dead and Jessie needed somebody there with him.
¶ 7. When Charles Anderson arrived at Archie’s trailer, Jessie opened the door wearing blue jeans, a shirt and tennis shoes. His arms were wet suggesting he had just washed them. Charles noticed Jessie had a little blood around the rims of his shoes and blood on his pants as though Jessie had been sitting in blood. Glancing inside, Charles asked, “What’s going on?” Jessie walked out the door answering, “Dad passed away. Let’s leave it at that.” Charles testified Jessie had a wild look in his eyes, as though he was “not really right in his mind.” Jessie told Charles that he had tried to revive Archie and that he had lain down beside his father.
¶ 8. Jessie insisted Charles take him to get his prescription for Xanax filled before calling the police. Jessie hit the truck door with his hand for emphasis. Instead, Charles offered Jessie a couple of Xanax he had. Charles instructed Jessie to walk to Lot No. 62 and tell Carl and David about Archie. Charles called 911 from a pay telephone and returned to Lot No. 7 to wait for the police.
¶9. According to David, Jessie told David and Carl that Jessie found Archie when he woke up. Jessie tried unsuccessfully to revive Archie. Carl testified Jessie was still intoxicated. Jessie asked Carl, “Did you or Kevin get daddy’s money?” Carl estimated Archie had $100 left of his Social Security check in his front pocket when Carl left at 2:00 a.m. Archie did not use a wallet, preferring to keep his money in the pockets of his pants.
¶ 10. Buddy Benignm, III, a paramedic employed by Delta Regional Medical Center, responded at about 9:45 a.m. to the 911 call placed by Charles Anderson. Upon arriving at the scene, Benignm pushed open the door and observed the body lying on the floor. Finding no pulse, Benignm notified the police department of a possible homicide. Benignm noted blood around the victim’s head, vomit coming from the victim’s mouth, bruises and abrasions on the body, and large patches of skin torn from one hand. The skin around the victim’s eyes was discolored indicating a head injury.
¶ 11.' Lieutenant Lon Pepper, the case management lieutenant in the criminal investigation division of the Greenville Police Department, roped off the crime scene and instructed the investigators to circulate in the neighborhood to locate witnesses.
¶ 12. Lieutenant Pam Miller and Officer Jay Boykin, Crime Scene Identification Division, Greenville Police Department, photographed and videotaped the crime scene. According to Lieutenant Miller, the trailer was in a state of disarray. Vodka bottles, beer and coke cans and cigarette butts were strewn. In addition to the blood found around the victim’s body, blood spatters were photographed on the cushions of the couch, on the walls of the living room, on a pillow found on a coffee table, on the counter in the kitchen, on a kitchen chair and around the kitchen sink. Found beside the back door in the kitchen area was a pile of bloody items, including a sheet, a blanket, and socks. A white plastic grocery bag containing a bloody pillow case and a bloody striped shirt was found on the counter next to the sink. In the back bedroom of the trailer, an investigator found blood droplets on a tissue roll. In the lavatory area, the commode appeared to have some blood transfer on it.
¶ 13. Several witnesses at the scene reported seeing Jessie Robert Pritchett, the victim’s son, coming out of his father’s trailer wearing black jeans, tennis shoes and no shirt with what appeared to be blood on him. The inebriated Jessie was located at Lot No. 62. Officer Joseph Chillis of the Greenville Police Department testified Jessie was outraged, balling up his fist, screaming for nobody to touch him. Sergeant Larry Miller testified the uncooperative Jessie told the officers “it *329 was just time for his daddy to go.” Sergeant Miller testified Jessie was wearing a red shirt and blue jeans.
¶ 14. Eventually, Jessie agreed to accompany the officers to the police station, but needed to put on his shoes. Sergeant Miller testified the lighting in the converted bus was poor, so he used his flashlight to see. Jessie sat down at the table and started drinking a beer. Walking toward the table, Sergeant Miller kicked something on the floor. Looking down, he saw it was a tennis shoe which appeared to have blood on it. Jessie spontaneously stated, “That’s not my shoe.” Sergeant Miller saw the other shoe under the table. Carl testified that he (Carl) assumed the shoe belonged to Jessie inasmuch as Carl was wearing his only pair of shoes and David was wearing his only pair.
¶ 15. Lieutenant Pepper was called to Lot No. 62 to talk Jessie out of the bus. Lieutenant Pepper testified that Jessie was drinking a beer and, generally, ready for a fight. Officer Pepper saw Jessie twice slam the side of his fist on a table. After talking with Jessie for about fifteen minutes, Lieutenant Pepper convinced Jessie to leave the converted bus peacefully.
¶ 16. Officer Chillis transported the shoeless Jessie to the police department, where he was booked and placed in the observation tank.
¶ 17. Lieutenant Pam Miller testified that, when the coroner arrived, the sheet was removed from the victim’s body. She noticed the pockets of Archie’s pants were turned inside out. What appeared to be blood was found on the inside of the pockets. Two dollars and a lighter were found under the body.
¶ 18. Dr. Hilton Stokes, deputy coroner for Washington County, testified numerous bruises, lacerations, and contusions were found on the victim’s body. Dr. Stokes determined that the victim had been beaten and suffered from blunt force trauma. The approximate time of death was calculated to be 3:00 a.m.
¶ 19. Dr. Steven Timothy Hayne, a pathologist employed as a deputy coroner for Rankin County and for the Department of Public Safety Medical Examiner’s office, performed an autopsy of the victim’s body. Dr. Hayne found the cause of Archie Pritchett’s death to be “blunt force trauma, bleeding to the left hematoma, the lacerations of the left lung, hemorrhage and contusions of the brain.” Dr. Hayne testified that the injuries identified on the victim’s body were consistent with injuries produced by a person’s hand or fist.
¶20. After the crime scene technicians finished collecting evidence at Lot No. 7, they went to the converted bus at Lot No. 62 to collect evidence pursuant to a search warrant. At that location, a pair of shoes and a pair of socks with what appeared to be blood on them were collected.
¶ 21. On June 5, a videotape and photographs were taken of Jessie’s hands to show the blood around his nail area, and of his shoulder and arm to show two scratches and a bruise. While taking the pictures, Lieutenant Miller noticed that Jessie’s knuckles appeared to be swollen. A pair of jeans were collected from the converted bus on June 5 by Officer Boykin pursuant to Sergeant Larry Miller’s instructions. Because a sock beside the jeans appeared to have blood on it, Officer Boykin collected it also.
¶22. While changing the linens on his bed on June 11, David Pritchett found black jeans belonging to Jessie under his mattress. Before he turned them over to the police, however, David had laundered the pants.
¶ 23. The jury heard testimony describing Jessie as Archie’s favorite son. Jessie and Archie lived together and owned a vehicle together. Charlotte Bennett testified that Archie and Jessie were very close. She also testified that Jessie was drinking heavily and had kicked a chair at Archie the evening of June 3. Sheila Anderson testified that Jessie would do anything for Archie and Archie would do *330 anything for Jessie. In the ten years she had known the Pritchett family, Sheila had never seen or heard Jessie be unkind to Archie. Charles Anderson testified he had broken up arguments among the Pritch-etts (Archie, Jessie, Carl and David) previously, but he never saw Jessie be aggressive or violent toward Archie. According to Charles, Jessie took care of Archie. David Pritchett testified he had broken up fights between his brothers and father.
¶ 24. An incident report completed by the Greenville Police Department showed David Pritchett had assaulted and taken money from Archie on July 4, 1995. Charges were filed by Archie on September 12,1995, alleging a person named Donnie had assaulted him in a robbery attempt. Further, when Kevin Terschell was interviewed on June 4 by Sergeant Miller, Kevin admitted he had assaulted and taken money from Archie in 1995. No charges were filed by Archie against Kevin.
¶ 25. A Washington County grand jury returned an indictment against Jessie Robert Pritchett charging Pritchett with the murder of Archie Pritchett. After a three-day trial, the jury returned a verdict finding Pritchett guilty of the lesser offense of manslaughter. The trial court sentenced Pritchett to a term of eighteen years in the custody of the Mississippi Department of Corrections.
¶ 26. Pritchett’s motion for a judgment notwithstanding the jury verdict or, in the alternative, for a new trial was denied. On appeal, Pritchett argues the verdict of the jury was the result of passion and prejudice due to the nature of the crime charged and evidence produced at trial and was against the overwhelming weight of the evidence.
ARGUMENT AND DISCUSSION OF THE LAW
WHETHER THE JURY VERDICT WAS THE RESULT OF IMPROPER PASSION AND PREJUDICE AND AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
¶ 27. Although his assignment of error refers only to the weight of the evidence, Pritchett’s arguments go to both the sufficiency and weight of the evidence. Subsequently to the jury verdict finding Pritchett guilty of manslaughter, he moved the trial court for a judgment notwithstanding the verdict or, in the alternative, for a new trial.
 ¶ 28. Pritchett’s challenge to the overruled motion for judgment notwithstanding the verdict tests the legal sufficiency of the evidence supporting the verdict of guilty on each element of the offense of manslaughter. This Court on appeal must consider all of the evidence presented in the light most favorable to the State, accepting as true the credible evidence consistent with the verdict. Fisher v. State, 481 So.2d 203, 212 (Miss.1985). The lower court’s denial of a JNOV motion will not be reversed unless, with respect to one or more elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty. Id. When, as here, the State’s case is based entirely upon circumstantial evidence, the State must prove the defendant guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. Rhodes v. State, 676 So.2d 275, 281 (Miss.1996).
¶ 29. Pritchett was convicted of manslaughter under Miss.Code Ann. § 97-3-35 (Rev.1994). Section 97-3-35 provides that “[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter.”
¶ 30. The jury was instructed regarding the State’s burden of proving Jessie Pritchett’s guilt beyond a reasonable doubt *331 and to the exclusion of a reasonable hypothesis. Instruction No. 11 read:
The Court instructs the Jury that this is a circumstantial evidence case. In a circumstantial evidence case the State of Mississippi is required to prove then-case to you, from the evidence, beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with Jessie Pritchett’s innocence.
If the State of Mississippi has failed to prove their case to you, from the evidence, beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with Jessie Pritch-ett’s innocence, then you are duty bound to find Jessie Pritchett not guilty.
¶31. Pritchett argues that the State failed to prove by way of its witnesses and evidence that he had killed Archie Pritch-ett to the exclusion of any reasonable hypothesis consistent with innocence. Pritchett’s hypothesis is that his father was beaten to death by someone other than Pritchett while Pritchett was asleep in the trailer. According to the statement given to the police on June 5, 1996 and read into the record by Sergeant Miller, Pritchett could not remember what happened due to his extreme intoxication:
Things are starting to get to where I can’t remember a lot [about the evening of June 3 and early morning of June 4]. I can’t remember what time Kevin -and [Charlotte] left. And I can’t remember what time Kevin left. I guess that I had started drinking so heavy, to tell you the truth, I don’t even know if they left. I’m sure Mark left because he has a family.... I don’t remember Carl leaving. And the next thing I remember is waking up. I don’t remember anybody else being there, but I didn’t go to the back of the trailer and look into the bedroom or the bathroom, but I found my dad on the floor.
¶ 32. A defendant’s version, if reasonable, must be accepted as true when the defendant is the only witness to a homicide, “unless [his version is] substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.” Lambert v. State, 462 So.2d 308, 314 (Miss.1984).
¶ 33. While the defense attempted to infer that Kevin Terschell was responsible for Archie’s death, no proof was offered to the jury supporting Pritchett’s theory. Evidentiary factors substantially contradicted Pritchett’s hypothesis. Carl Pritch-ett testified that he was at Archie’s trailer when Kevin left. Charlotte testified she left the trailer with Mark Box, who dropped her off at her uncle’s house. Charlotte called a taxi to transport her home from her uncle’s house. When the taxi arrived, Kevin was a passenger in it. A dispute erupted between the cab driver and Kevin over fare, and the driver forced Kevin and Charlotte out of the cab. The couple caught a ride back to Kevin’s house where they stayed the remainder of the morning on June 4. Further, Sergeant Miller testified that Kevin was interviewed at his apartment on June 4 and eliminated as a suspect. The jury heard testimony of Sergeant Miller that Kevin admitted he had robbed Archie of $400 in 1995. However, Archie refused to file charges. Kevin later apologized to Archie and apparently was forgiven inasmuch as Kevin was a guest at Archie’s trailer on June 3.
¶34. Circumstantial evidence presented by the State supporting the jury’s verdict include (a) testimony that only Jessie and Archie remained at the trailer after 2:00 a.m.; (b) Rosie Craft heard sounds of someone being beaten up at 2:30 a.m.; (e) witnesses saw Jessie coming out of his father’s trailer the morning of June 4, wearing tennis shoes, pants and no shirt; (d) what appeared to be blood was on Jessie’s pants and tennis shoes; (e) Jessie’s denial that the blood spattered tennis shoes found at Lot No. 62 were his; (f) Carl Pritchett’s testimony that the tennis shoes found in the converted bus located at Lot No. 62 were Jessie’s shoes; (g) a plastic bag recovered from the trailer con *332 tained a bloody shirt belonging to Jessie; (h) Charles Anderson’s testimony that Jessie had a wild look in his eyes the morning of June 4; (i) testimony that Jessie was intoxicated and belligerent on the day of the murder; (j) an autopsy of the body revealed, and experts testified, that Archie Pritchett was beaten to death by a person’s fists and hands; (k) blood found under Jessie’s fingernails and scratches on his arms and shoulders; and (Z) Jessie’s hands appeared swollen in the photographs and videotape taken on June 5, 1996.
¶ 35. By convicting Pritchett of manslaughter, the jury found that the State proved, beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with Pritchett’s innocence, that Pritchett unlawfully, willfully, felo-niously, and without malice aforethought, but in the heat of passion, and not in necessary self-defense, killed Archie Pritchett. Accepting the evidence favorable to the State as true, together with reasonable inferences, we find the State’s circumstantial case was sufficient to support the jury verdict.
¶ 36. “The jury is charged with the responsibility of weighing and considering the conflicting evidence and credibility of the witnesses and determining whose testimony should be believed.” McClain v. State, 625 So.2d 774, 781 (Miss.1993) (citations omitted). Pritchett’s challenge to the weight of the evidence via motion for a new trial implicates the trial court’s sound discretion. Id. The decision to grant a new trial “rest[s] in the sound discretion of the trial court, and the motion [for a new trial based on the weight of the evidence] should not be granted except to prevent an unconscionable injustice.” Id. The Court will reverse only for abuse of discretion, and on review will accept as true all evidence favorable to the State. Id.
¶ 37. The jury was within its purview to weigh the evidence and the credibility of the witnesses’ testimony and to convict Jessie Pritchett. The jury verdict was not so contrary to the overwhelming weight of the evidence that to allow it to stand would have been to promote an unconscionable injustice. The trial court did not abuse its discretion by refusing to grant a new trial based on the weight of the evidence.
CONCLUSION
¶ 38. Because the guilty verdict is supported by the evidence and Jessie Pritch-ett has failed to convince us that the trial judge erred in overruling his motion for new trial, this Court affirms Jessie Pritch-ett’s manslaughter conviction.
¶ 39. THE JUDGMENT OF THE WASHINGTON COUNTY CIRCUIT COURT OF CONVICTION OF MANSLAUGHTER AND SENTENCE TO A TERM OF EIGHTEEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. COSTS OF THIS APPEAL ARE TAXED TO WASHINGTON COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., COLEMAN, DIAZ, IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.